C6ceeidc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    E.I. DU PONT DE NEMOURS AND
     COMPANY,
4
                    Plaintiff,
5
             v.                          12 MC 120-P1
6
     KOLON INDUSTRIES, INC.,
7    et al.,

8                   Defendants.

9    ------------------------------x

10                                       June 12, 2012

11                                       10:20 a.m.

12
     Before:
13
                        HON. JOHN G. KOELTL,
14
                                         District Judge
15
                            APPEARANCES
16
     KOBRE & KIM
17         Attorneys for Plaintiff
     BY:  MICHAEL SANGYUN KIM
18         MARCUS GREEN

19   PAUL HASTINGS, LLP
           Attorneys for Defendant Kolon Industries
20   BY:  GLENN D. DASSOFF
           ABIGAIL W. LLOYD
21
     TRACHTENBERG, RODES & FRIEDBERG
22         Attorneys for Garnishees
     BY:  DAVID TRACHTENBERG
23         STEPHEN ARENA

24

25

C6ceeidc

1            (In open court)

2            THE DEPUTY CLERK:  Du Pont vs. Kolon.  All parties

3     please state who they are for the record.

4            MR. KIM:  Good morning, your Honor.  Michael Kim and

5     Marcus Green, Kobre & Kim for Du Pont.

6            THE COURT:  Good morning.

7            MR. DASSOFF:  Good morning, your Honor.  Glenn Dassoff

8     for Paul Hastings, LLP, specially appearing for Kolon

9     Industries, Inc.  And with me, my colleague, also specially

10    appearing, Abigail Lloyd.

11           MR. TRACHTENBERG:  Good morning, your Honor.  David

12    Trachtenberg, Trachtenberg, Rodes & Friedberg, and Stephen

13    Arena for Shinhan Bank and Shinhan Financial.

14           THE COURT:  Good morning, all.  Good to see you all.

15           I should point out, it occurred to me that I have a

16    friend who worked at Du Pont's counsel's office in Delaware.  I

17    believe he's retired now.  Nothing about that affects anything

18    that I do in the cases.

19           All right.  There are three motions pending before me

20    today.  There is the turnover motion against Kolon.  There is

21    the status quo motion against Kolon.  And there's the motion to

22    compel compliance from Shinhan.

23           I'm familiar with the papers.  I'm prepared to listen

24    to argument.  Mr. Kim?

25           MR. KIM:  Thank you, your Honor.

C6ceeidc

1          Your Honor, I was giving thought, in preparation for

2     addressing the Court, as to what areas I think the parties

3     could have done a better job briefing that I could address

4     orally that might be of assistance to the Court in rendering

5     its decision.  So I thought that I would focus most of the

6     discussion on the agency branch of the personal jurisdiction

7     cases, and in particular, how factually, if one were to apply

8     it to this case, the picture looks, and in particular with

9     reference to the very particular affidavits submitted by Kolon.

10    And I wanted to discuss with your Honor, explain to your Honor

11    why we have -- on the basis of the record there is sufficient

12    basis for the Court to find personal jurisdiction over Kolon

13    Industries/Kolon Corp., or at the very least, order

14    jurisdictional discovery, as would be Du Pont's right on the

15    present record.

16          I want to just focus on that, and then there are, I

17    think, various other, I think, less involved issues that I'd

18    like to move on to.  But if your Honor prefers a different

19    order or has an area you really want to talk about now, you're

20    the one making the decision so I will conform myself.

21          THE COURT:  That's fine.  I always want to hear what

22    counsel has to say.

23          My concern, which I raised with you last time and

24    really hasn't abated -- in fact, it's increased, as I look at

25    the papers and contemplate the papers against three additional

C6ceeidc

1  banks and the additional motion against Kolon to, quote,

2  maintain the status quo -- I ask myself, why is this here?  I

3  can understand assets in New York.  You have a judgment and

4  you're trying to enforce the judgment.  And if you have an

5  uncooperative defendant, huge as it is, you go looking for

6  assets wherever they can be found and you pursue those assets.

7  And so if there are assets in New York, you pursue the assets

8  in New York.  Okay.

9          The remarkable thing about this case is you have this

10  huge defendant with over a billion dollars worth of worldwide

11  revenue a year, turns over revenue at an enormous pace, very

12  large company.  You have personal jurisdiction over that

13  company in Virginia.  You've gotten some very favorable rulings

14  from the judge in Virginia, including keeping track of assets,

15  watching dispositions of amounts in excess of $250,000, details

16  about all of the bank accounts in Korea.  No assets pointed out

17  to me in New York.  And yet there is a multiplicity of motions

18  being made to the Court in New York, including some that are,

19  you know, really out there, like the motion to compel Kolon to

20  maintain the status quo where there, at the very least, is a

21  question about personal jurisdiction.

22          So you come to a court in New York and say, well, we

23  maintain that we have personal jurisdiction and maintain --

24  tell Kolon to maintain the status quo.  What does that add, one

25  would ask, to what you can reasonably get or have gotten from

C6ceeidc

1   the judge in Virginia, who plainly has personal jurisdiction

2   over Kolon in Virginia?  Would Kolon listen to me more than to

3   the judge in Virginia?  Are you going to make, you know --

4   plainly, you are -- a series of continuing motions to the Court

5   in New York when you got the defendant in Virginia?

6          And I raised this last time.  It has the aspect of

7   multiplying the proceedings without a good basis.  As I said,

8   if there were assets in New York that you wanted to seize in

9   New York, that's one thing.  To come to New York as simply a

10  second front in the battle against Kolon and to try and

11  establish personal jurisdiction over Kolon, and then to use

12  that to get the same relief that you could get against Kolon in

13  Virginia, one would ask, why?  I realize that the amount

14  involved in the judgment is huge, but that doesn't justify huge

15  legal fees and multiplying the legal fees.

16          There is a footnote in Kolon's brief that says, you

17  know, Judge, you could simply state all of this and await for

18  the applications to be made in Virginia.  I haven't done that,

19  and I wouldn't do it without briefing.  But that has a certain

20  appeal.

21          One would ask, why New York?  Why not California?  Why

22  not Texas?  What's the about basis for bringing what is now,

23  today, three motions before me and three more in the wings

24  against other banks and who knows what else?

25          So that's a preliminary observation.  And, again, I

C6ceeidc

1    don't want to throw you off from the argument that you wanted

2    to make.  It is a concern.

3              MR. KIM:  No, I appreciate that, Judge.  And I'd like

4    to sort of address that head on first, before we move to the

5    personal jurisdiction points, if I may.

6              THE COURT:  Sure.

7              MR. KIM:  Your Honor, I think in fairness, the various

8    bank motions that we have brought, we think we explained a bit

9    last time, but I really need to clarify that we are not just

10   trying to multiply motions on the Court's calendar.  The fact

11   is that we had suggested that those motions, the restraints and

12   the banks being on notice, were necessary, but that the Court

13   put them aside so that neither the banks nor Du Pont would have

14   to expend legal fees, and the Court wouldn't have to expend its

15   time pending adjudication of the Kolon motion.

16             Now, I think it's immensely important to sort of

17   contextualize why we're doing what we're doing.  What we are

18   trying to do in New York may really make the difference between

19   this judgment debtor, who's really been the victim of a crime

20   in getting adequately compensated in any reasonable period of

21   time or not.

22             First, with respect to your Honor's questions about

23   the banks, why move against the banks?  Why not just do a

24   proceeding in Virginia against Kolon?  Well, the fact is,

25   Judge, that Kolon has a big portion of its assets, cash in

C6ceeidc

1    these banks.  And obviously for a judgment creditor that's the

2    most feasible thing to try to seize.  Not a whole lot you can

3    do with a factory that's in rural Korea.  I'm not sure if I

4    could disassemble, bring it over here and give it to Du Pont.

5    So the cash obviously is a very important component.

6         THE COURT:  A garnishment order, that, you could get.

7    The company has huge revenues which it turns over.

8         MR. KIM:  Yes, your Honor.  And we are moving against

9    customers, but I think with respect to the cash, I think it is

10   reasonable obviously for a judgment creditor to be focused on

11   the loose cash that the debtor has.  Now --

12        THE COURT:  And if you have personal jurisdiction,

13   which you do, over Kolon in Virginia, why could not the judge

14   in Virginia be asked to require Kolon to turn over money that

15   it has control of in banks?  Exactly what you're asking me to

16   do.

17        MR. KIM:  Correct, it could, but I think there are a

18   couple of things I'd like to really clarify there.

19        First of all, with respect to the banks, it's a fact

20   that Kolon has sent reports of what it supposedly has in these

21   banks and yet has consistently refused to allow those banks to

22   confirm or verify any of it.  I think even that fact alone

23   should be worrisome and is worrisome.

24        THE COURT:  But you're not answering the question.

25   Why not ask the judge in Virginia to require Kolon to turn over

C6ceeidc

money that it has in banks?  The judge has already required

Kolon to tell you what banks, what accounts, how much money.

You've determined what the accounts are, what the numbers are.

You've determined that there's over $70 million in banks in

Korea, and you have a judgment debtor before the Court in

Virginia.  Have you even asked?

          MR. KIM:  No.  We have moved here for a turnover

order, Judge.

          THE COURT:  Why?

          MR. KIM:  Well, a few different reasons, Judge.

          First, because the statute explicitly permits us to do

so.  This is different from a forum shopping argument

prefiling, where judges can legitimately ask, isn't this case

better litigated elsewhere, based on convenience of witnesses,

knowledge of the judge, etc?  And a federal statute explicitly

allows the judgment creditor to register the judgment in other

jurisdictions.  And if there is personal jurisdiction or other

in rem jurisdiction, etc., it is completely legitimate for

different districts to be involved in judgment --

          THE COURT:  I know, I know, but I would suspect that

the legislative history of that statute would indicate that you

register judgments in different jurisdictions so that you can

get assets in those jurisdictions easily.  It's not for the

purpose of getting jurisdiction over the -- or pursuing the

judgment debtor, whom you're pursuing in the district where you

C6ceeidc

1    have a judgment.

2          And it's not the case where, as in *Gucci*, which you

3    like to cite to me, there is a default judgment.  And so you've

4    got a -- you know, you've got a fly-by-night debtor who's never

5    appeared, and you have to go to districts to try and enforce a

6    judgment.

7          Here you have an established company, personal

8    jurisdiction and, you know, of course, I understand the

9    argument, we've made the motion because we could and the

10   statute allows us to do it.  We've registered.  We're pursuing

11   it, and we're here because the statute gives us the right to be

12   here.

13         And the corollary to that is, Judge, we have a right

14   to make the motion, and it's your duty to decide it.

15         MR. KIM:  And you have the right to deny it,

16   obviously.

17         THE COURT:  And I understand that.

18         MR. KIM:  Let me try to persuade you, because I

19   understand where your Honor is coming from.  And if I were in

20   your shoes, obviously, if I felt that -- you know, we are

21   working through a lot for personal jurisdiction, I understand

22   that.  Your Honor spends a lot of time on it.  Counsel spends a

23   lot of time on it.  And it is a legitimate question, why are we

24   doing this in New York and not Virginia, okay?

25         First of all, the Virginia --

C6ceeidc

1          THE COURT:  Because --

2          MR. KIM:  Go ahead, Judge.

3          THE COURT:   -- you have the preliminary question in

4  New York whether there's personal jurisdiction.

5          MR. KIM:  Correct.

6          THE COURT:  The question -- which doesn't exist in

7  Virginia.  So you have to move through all of these

8  preliminaries in New York to get to the point where you are in

9  Virginia.

10         And the one question which I -- you know, I've asked

11 you last time, I pondered the answer and I still don't

12 understand the answer, why not seek the relief in Virginia?  I

13 mean --

14         MR. KIM:  I'm going to give you that answer.

15         THE COURT:  Great.

16         MR. KIM:  So, first of all, the Virginia court does

17 not have jurisdiction over the banks, as far as I can tell.  We

18 are --

19         THE COURT:  Okay.  But we're talking about why is --

20 you've told me, put the bank stuff on hold.  Let's get to

21 Kolon, and you can decide the issues with respect to Kolon.

22 And once you've decided the issues with respect to Kolon, then

23 you can begin to make orders against Kolon and everything will

24 be fine.

25         My question is:  Why not ask for that relief in

C6ceeidc

1    Virginia, where you don't have to go through all the

2    preliminaries to say, let's get jurisdiction over Kolon?  And

3    to give you a window, I think you've made some showing with

4    respect to jurisdiction in New York, but I don't think that

5    it's sufficient.  So you will have jurisdictional discovery

6    with respect to Kolon in New York, jurisdictional discovery.

7    I'll give you 60 days to do jurisdictional discovery to

8    establish that Kolon is present in New York.  So 60 days hence,

9    in New York, you will be at the point where you are in

10   Virginia.  And for some reason, which you still haven't told me

11   but you promised to tell me --

12           MR. KIM:  I promise.

13           THE COURT:  -- why you want to ask the judge in

14   New York rather than the judge in Virginia, or indeed, ask them

15   both.  But if you ask the judge in Virginia, then the judge in

16   New York may well say, well, wait a moment, you already asked

17   the judge in Virginia.

18           MR. KIM:  I don't like to ask two judges for the same

19   thing.  I think at least one of them thinks their time is being

20   wasted.  But --

21           THE COURT:  That's all we do, by the way.  Never rely

22   on an argument of time with respect to me, because we have all

23   of the time in the world.  All we do is to decide cases; if not

24   yours, someone else's.  So ...

25           MR. KIM:  Well, as I mentioned a few minutes ago, I

C6ceeidc

1    think whether this case is in New York or Virginia might very

2    well make the difference between whether this judgment creditor

3    gets compensated in a reasonable period of time or not.  And

4    the simple fact is, Judge, just to be very straight with you,

5    Virginia law is very undeveloped in this area as to foreign

6    assets owned by a foreign judgment debtor.  I believe that the

7    face of the Virginia turnover statute -- because, as your Honor

8    knows, federal courts borrow or import debtor creditor laws of

9    the state in which the district sits.  I believe Virginia have

10   a turnover statute, should afford a similar remedy.

11          But as your Honor knows, because of New York being

12   what it is and the center of a lot of international commerce, a

13   number of very complicated issues that can arise with respect

14   to various assets that are overseas and whether a foreign

15   judgment debtor can be ordered by a US District Court to give

16   up those foreign assets have been litigated extensively in the

17   Second Circuit and in New York State and all been answered

18   conclusively, such that a jurist sitting in New York, whether

19   it's your Honor or another Part I judge on a number of issues I

20   know Kolon's able lawyers will bring up over the next few

21   months, really simply need only look at the case law and will

22   have ready answers to a majority, if not all of the questions

23   that will arise.

24          What will happen in Virginia if I were to have applied

25   there first, we have a capable judge there.  Obviously I would

C6ceeidc

get a full and fair hearing.  But what would happen is that,
number one, we would get into a long and protracted debate over
Virginia law in this area with respect to foreign debtor with
foreign assets.

        And then secondly, there are literally scores of other
issues with respect to particular assets, the reach of the
Court's power, etc., that New York itself spent really the last
few decades working its way through that are not answered in
Virginia.

        Now, I'm going to advocate my positions there, if
that's where your Honor ultimately sends me; I hope not.  And
by the time I'm done, we may or may not have a just result for
the judgment creditor here.  And that's why I'm doing it; not
because I'm a New York lawyer and I wanted something to do.
I've got plenty of things to do.  I could do it in Virginia or
here, but I really thought for the fair adjudication of a
judgment creditor who's faced with a judgment debtor that is
really doing the following, by their own admission, the bond,
the appellate bond costs 40-something million dollars a year.
By their own admission, even the self-reported figures, they
have transferred $500 million over the last several months.
They can afford to bond this judgment, yet they have not.  They
can afford to pay part of this judgment, yet they have not.
They purport to give asset disclosures but consistently refuse
to allow any third party to verify them.

C6ceeidc

1           And of course your Honor is familiar with the original

2     facts that led to the judgment.  This is not a simple

3     commercial dispute.  There is a heavy enough section with

4     criminal activity here.

5           So that's the primary reason that I brought this in

6     New York, because I thought without New York law, we may really

7     very well have a situation where you may have a number of well

8     intentioned judges presiding over this, but because of the

9     context of Virginia law and other issues, we may just be mired

10    over the next several months in arguing out issues that are

11    quickly resolved here.

12          And secondly, since the Virginia court doesn't have

13    jurisdiction over the banks, if Kolon essentially refuses to

14    give these irrevocable instructions to the banks, as it

15    basically is telling the Court it would be some kind of Korean

16    crime for them to do so, because I think that's a pretty good

17    indication that they don't have a desire or a plan to comply

18    with a US District Court order with respect to these

19    instructions -- I don't understand it either, Judge.  That's

20    just what they said.

21          THE COURT:  Because I hadn't read any of the papers

22    before me to suggest that a customer of a bank could not order

23    a bank to turn over records, turn over --

24          MR. KIM:  I agree.  It doesn't comport with common

25    sense for Kolon to suggest that it would be some type of

C6ceeidc

1   violation of Korean law for a customer to basically disclose

2   his own assets to third parties.

3           But be that as it may, I think the -- the situation we

4   would have down in Virginia, not only the problems with --

5   against the judgment debtor, but because we don't have

6   jurisdiction over any of the banks, when Kolon -- not if, when

7   Kolon does not issue these instructions, there will have been

8   many months.  And we'll have nothing actually restraining the

9   banks, no actual legal action against the banks, which is also

10  an untenable situation.

11          So I knew we have to have something against the banks.

12  And so I was choosing between having a Virginia turnover

13  application and the perilous set of New York bank applications

14  all before two judges somehow trying to coordinate the two or

15  having the New York -- where I believe there is personal

16  jurisdiction, or there will be, unless your Honor sees the

17  discovery hopefully -- having a New York judge preside over all

18  the bank applications and a New York turnover application, such

19  that if the New York judge deems it appropriate, the bank

20  applications can be put on hold with the banks, obviously on

21  legal notice of what's happening.  And then if there is a

22  turnover order against Kolon, the bank applications fall away.

23          But if Kolon does not comply with the Court's orders,

24  as it very well might not, the bank applications have to be

25  pursued anyway.

C6ceeidc

1           So ultimately I thought for these two reasons --

2     first, New York law itself doing justice here; and secondly,

3     the fact that the banks have to be involved anyway -- that this

4     was really, in fact, the most efficient thing for my client,

5     and really the system.

6           THE COURT:  Are you so unsatisfied with the available

7     remedies in Korea?

8           MR. KIM:  Yes.  If you assume we're a profit

9     maximizing rational actor, based on all the information we've

10    received, we do not believe it's a pragmatic solution at this

11    point.  And I think a US District Court judgment now really has

12    to be enforced in the US courts, or at least elsewhere outside

13    of Korea.  And that's why we're doing what we're doing.

14          So I hope that answers your Honor's question about why

15    I filed all this paper and why we're doing it this way.  I

16    think it will make a big difference at the end of the day where

17    we are.

18          THE COURT:  It's hard -- okay.  I mean, I accept

19    plainly what you say.  It's hard to believe that it is an open

20    question in other jurisdictions, whether if you have personal

21    jurisdiction over a debtor you can order the debtor to comply

22    with the orders of the Court.

23          MR. KIM:  I'm with you, Judge.  I feel that way, but

24    there are a number of -- New York itself took a long time to

25    work through that question, partly because of foreign

C6ceeidc

1    exemptions.  There are foreign debtor creditor laws that

2    purport to give certain types of exemptions on their

3    applicability when a debtor here is being ordered to give up

4    foreign assets.  That's been one big area of a lot of judicial

5    sort of contemplation.

6            There are various other areas that come up, but I

7    agree with your Honor, if a party is before the Court and

8    subject to the Court's jurisdiction, the Court really should be

9    able to tell that party to do anything, including bring assets

10   from the other side of the planet here.  But that issue itself

11   is an issue of legislative construction on that particular

12   turnover statute.

13           THE COURT:  All right.  I understand.  *Koehler* itself

14   was four to three on the power of the Court to order production

15   of assets outside of New York.

16           MR. KIM:  That's right.  And I think the problem here,

17   Judge, is that the power, the turnover power against the debtor

18   is a creature of state statute and not the common law.  So your

19   Honor would be, I'd say, unqualifiedly mathematically correct,

20   if we're just talking about a court's inherent equitable power

21   for a person before it.  I think the complication becomes when

22   these legislature enact these turnover laws, each with a

23   slightly different wording.  Then the judges have to construct

24   whether the legislature wanted different result.  And that is

25   really what causes the complication in this area of the law,

C6ceeidc

1    which New York has worked, really worked decades to work

2    through and really answer virtually almost every question that

3    one could raise in this pretty complicated area.

4                THE COURT:  All right.

5                MR. KIM:  So ultimately I submit it will save the

6    Court a lot more time once we're past the personal jurisdiction

7    point to adjudicate this dispute.

8                Now, I had planned a whole discussion about personal

9    jurisdiction and why you should give me discovery, but I'm

10   going to skip that because one of the first things I was taught

11   at the US Attorney's Office when I first learned how to do it

12   is to move on from anything that you decided.  And I wanted

13   to --

14               THE COURT:  If it's decided in your favor.

15               MR. KIM:  Correct, Judge.  So I think with respect to

16   the other issues, if your Honor wants to hear something about

17   the Hague Convention --

18               THE COURT:  About what?

19               MR. KIM:  About the Hague Convention issue.  Obviously

20   from your Honor's jurisdictional and discovery decision, I

21   think we've -- that issue is necessarily resolved in our favor.

22               THE COURT:  I'm not impressed by the argument under

23   the Hague Convention any more than I was impressed by your

24   initial argument that Kolon's -- what I'll call special

25   appearance to resist the order against Shinhan Bank subjected

C6ceeidc

1   them to general personal jurisdiction.

2           MR. KIM:  I agree that I should have been more

3   specific and you shouldn't have -- you should not have been

4   impressed by that branch of the argument.  But there is

5   actually a little bit more there.

6           THE COURT:  It was an argument that really shouldn't

7   have been made only to be abandoned in reply.

8           MR. KIM:  Well, actually, I wasn't going to abandon

9   the argument wholesale.

10          Here's the part that you may be -- is a real issue

11  sort of within that bracket, which is I agree that the filing

12  of the brief in the bank turnover proceeding itself does not

13  trigger wholesale general in personam jurisdiction, which would

14  expose Kolon to kind of, you know, any kind of liability or any

15  kind of order that the Court with want to fashion.

16          However, as your Honor knows, the Federal Rules of

17  Civil Procedure, when they were enacted, did not explicitly,

18  did not provide for a special appearance.  4(e) explicitly

19  actually just does not happen.  So the cases that talk about

20  what happens if you, quote/unquote, specially appear in a

21  federal case, borrow from the quasi in rem case law for the

22  state in which that district sits.

23          And here, while I agree with your Honor that the mere

24  fact that Kolon filed a brief in the Shinhan proceeding itself

25  should not trigger automatic in personam jurisdiction

C6ceeidc

1   generally, what I would submit is by the same quasi in rem

2   principles in the cases Kolon has cited, that if the Court were

3   to fashion an order adjudicating Kolon's rights and obligations

4   with respect to the property at issue in those proceedings,

5   i.e. Kolon being ordered to do things with those bank accounts,

6   that actually would be an appropriate exercise in personal

7   jurisdiction under *International Shoe* principles; because, as

8   your Honor knows, when a party comes in even objecting to

9   personal jurisdiction, what happens is when the Court

10   adjudicates various issues, even with respect to that special

11   appearance in the quasi in rem proceeding, they're bound by it.

12   They can't later collaterally attack it.

13          So when a party is coming in under the quasi in rem

14   case law to say that, I believe that XYZ should be done with

15   the property instead, the Court can adjudicate that narrow set

16   of issues and bind the party to it.

17          Now, what I would suggest your Honor is that while

18   your Honor is correct that Kolon should not be subject to just

19   endless in personam jurisdiction generally as a result of their

20   having injected themselves into the bank turnover proceeding, I

21   would submit that they have subjected themselves to the Court's

22   power in terms of the Court issuing interim relief with respect

23   to the bank accounts themselves; in other words, what Kolon

24   should do with the bank accounts, instructions issued to the

25   banks, disclosure in the banks and so forth.

C6ceeidc

1              And I think that comports with the very principles of

2      the quasi in rem case law that this Court would borrow from

3      New York State case law, which is when the party comes in and

4      says, I want to participate in the adjudication of this piece

5      of property, they are subjecting themselves to the Court's

6      jurisdiction insofar as that property goes.

7              THE COURT:  Okay.  Go ahead.

8              MR. KIM:  So, your Honor, I think that really leads to

9      the injunction against Kolon.  I suppose the Court could be

10     thinking of it one of two ways.  If you're ordering

11     jurisdictional discovery, you might be thinking that you want

12     the jurisdiction at discovery complete first before you take up

13     the interim injunction to preserve assets.  That's one

14     approach, obviously.

15             THE COURT:  It's a prerequisite.  I wouldn't have the

16     right to issue such a new order if I had no personal

17     jurisdiction over Kolon.  The law says there's no personal

18     jurisdiction.  It's a matter which is certainly disputed.

19             MR. KIM:  What I would suggest, your Honor, is that

20     your Honor does have the power and should issue the interim

21     order, even while the personal jurisdiction is taking place

22     with respect --

23             THE COURT:  By the way, your turnover order that you

24     request wasn't limited to, for example, the Shinhan Bank

25     account in which there was a special appearance.  It's all --

C6ceeidc

1    essentially all --

2              MR. KIM:  The turnover order against Kolon is premised

3    upon -- I believe there's both personal and general

4    jurisdiction otherwise.

5              THE COURT:  Yeah.  So the argument of sort of general

6    personal jurisdiction based upon their appearance being the

7    equivalent of a motion to intervene, I mean, it was just wrong.

8              MR. KIM:  I think with respect to the bank accounts

9    it's right.  I think with respect to the injunction on the bank

10   accounts, which are the very property that's the subject of the

11   quasi in rem proceedings, as Kolon calls them, I think it's

12   right.

13             THE COURT:  Okay.  Go ahead.

14             MR. KIM:  So what I'm suggesting, your Honor, with

15   respect to the bank accounts, the injunction, is that while

16   your Honor -- while I understand what your Honor is saying is

17   that to just issue a blanket order against Kolon generally

18   would require a finding of in personam jurisdiction, that could

19   only follow an analysis after jurisdictional discovery.

20             With respect to the bank accounts themselves, what I

21   would suggest is that your Honor issue the injunction that we

22   request or some variation thereof to preserve the bank accounts

23   and to give instructions for disclosure to the banks.  Because

24   I think that would actually be narrowly tailored to hit

25   precisely the subject, the res, essentially, of the proceeding

C6ceeidc

1   in which they brought themselves in.

2               THE COURT:  Okay.  Anything else?

3               MR. KIM:  So there arises sort of the practical

4   question of what to do with the bank disclosure application

5   against Shinhan, and that there are others obviously in the

6   pipeline.

7               It seems to me, Judge, that the set of questions there

8   are very much intertwined in one important aspect with the

9   question of whether Kolon, A, will be ordered to turn over the

10  information in the banks, in other words, to give these

11  instructions to the banks; and B, whether it will comply.

12              In the following sense that if Kolon let's say doesn't

13  comply and doesn't issue these instructions, then I think

14  Du Pont would be able to say to the Court that there really is

15  no other way we're going to get this information.  Shinhan Bank

16  is the only possessor of this information, since Kolon refuses

17  to give it up.

18              THE COURT:  I don't understand why the information

19  that you're seeking from Shinhan is different from the

20  information that the judge has required to be provided to you

21  in Virginia.

22              MR. KIM:  It shouldn't be, but the difference is it

23  comes from a third party that is verifiable.  I think that's

24  the reason that all these judgment enforcement discovery

25  devices allow us to get information from banks; because when

C6ceeidc

1   the debtor says these are all the people I've transferred it

2   to, this is all the money I have, we should be able to just get

3   a bank to tell us that's true.

4           THE COURT:  Has the judge in Virginia required that

5   you be given bank statements as opposed to simply the report of

6   the debtor?

7           MR. KIM:  He has not required it.  Kolon has provided

8   summaries of what it has in its banks and its bank activity,

9   but not the actual -- whatever they might make and say it's

10  bank statements.

11          Judge, I also want you to understand the context,

12  because it does seem ridiculous if I'm saying IBM sent me a

13  document, I'm not sure if it's true, but that's not what we

14  have here.  We actually have a 90-page spoliation evidence

15  opinion, because these people were basically destroying

16  documents and making things up.

17          THE COURT:  Sure, but there are -- yes.  I mean, I

18  understand about fraudulent statements.  But one would think

19  that if there was a question whether the statements in the

20  accounts are true, the judge who ordered that you be given the

21  accounts, if you have reason to believe that the information is

22  not accurate, would follow up with such things as copies of the

23  bank statements, yes.  Can they be doctored?  Yes.  But, you

24  know --

25          MR. KIM:  But I don't know how I would ever be able to

C6ceeidc

1    tell that a bank statement or a self-reporting of a bank

2    transfer would be inaccurate, other than comparing it against

3    the extra records from the bank.

4            THE COURT:  It would really be foolhardy, wouldn't it,

5    with a judgment of over $900 million which is not going away

6    unless it goes away on appeal, to be producing fraudulent bank

7    statements?  It's not as though Du Pont is going away.

8            MR. KIM:  No more foolhardy than actually engaging in

9    a criminal conspiracy to steal the trade secrets in the first

10   place, which they have done.

11           THE COURT:  Okay.

12           MR. KIM:  Or to doctor and make up documents, which

13   they have done in front of a federal judge.

14           So I think, Judge -- I just want you to know, I mean,

15   I might sound paranoid if I say I want to verify it with the

16   banks, but that's what I'm trying to do.

17           THE COURT:  Okay.

18           MR. KIM:  I think there's no other practical solution.

19           So I think practically, what do we do with these bank

20   disclosure applications?  It seems to me even if you deny it

21   and say Shinhan is sort of, you know, under all this Korean law

22   pressured, therefore it's not appropriate to put them in this

23   awkward position, if and when Kolon refuses to give these

24   instructions to Shinhan to, you know, disclose information,

25   etc., we'll just be back here basically saying, now the

C6ceeidc

1    balancing of the factors are such that we have no other

2    recourse except to get it from Shinhan; whereas right now we

3    can't say that because the Kolon matter has not been fully

4    adjudicated.

5         So it seems to me the only practical thing to do with

6    these turnover applications is we could do it twice -- I'm

7    sorry, the disclosure applications in the banks, we could do it

8    twice and have another set of applications when Kolon refuses

9    to give these instructions, or we could have these bank

10   disclosures adjudicated after the Kolon disclosure order of the

11   injunction is adjudicated and Kolon refuses to comply, at which

12   point then it would become fully ripe and adjudicated once.

13        THE COURT:  Sufficient unto the day, you know, I have

14   an application before me, and I'll decide it based upon what's

15   before me now, all of them.

16        MR. KIM:  So I think on the --

17        THE COURT:  I think you should finish up, because I

18   really have to listen to the other parties before I decide.

19   And --

20        MR. KIM:  I think my time is better used in addressing

21   any new points they bring up now.

22        THE COURT:  Okay.

23        MR. DASSOFF:  Good morning, your Honor.

24        THE COURT:  Good morning.

25        MR. DASSOFF:  I'm going try to keep my comments brief.

C6ceeidc

1          There are three issues I want to talk about.  The

2     first one is to talk about the circumstances under which Kolon

3     specially appeared in the Shinhan preliminary injunction

4     hearing.  And you need to put that in context to really

5     understand what happened.

6          Du Pont has conducted extensive discovery in Virginia.

7     It has the right to do so post judgment.  It has asked for

8     extensive financial documents.  We have produced, I've been

9     told, over 7,000 pages of those documents, most, if not all, in

10    Korean.  Whether they include the bank statements or not, I'm

11    not sure.  It would be easy for me to find out, but I believe

12    they do.  If they don't, they can ask for them.

13         So the notion that somehow we're not being honest or

14    that we need a second look to confirm the accuracy of what's

15    being certified under oath by an officer of Kolon to Du Pont on

16    an almost daily basis under the order in Virginia, I think, is

17    a bit misleading.

18         The circumstances of their action against Shinhan here

19    are interesting.

20         THE COURT:  Could I just pause for a moment.

21         One of the things I do this morning when I'm on Part I

22    is I do attorney admissions.  Knowing the motions I have on

23    this morning, which is also part of Part I, I sense that there

24    are people in the courtroom who are here for attorney

25    admissions, not just for the motions.

C6ceeidc

1          It's not necessary to stand, by the way.  You're

2     welcome to take seats in the jury box.  And when I'm told by my

3     deputy that everyone is here for attorney admissions, we'll

4     break in the argument on the motions and do the attorney

5     admissions.

6          Go ahead.

7          MR. DASSOFF:  Thank you, your Honor.

8          So Du Pont went in ex parte and, I mean, really

9     ex parte.  I've practiced for 31 years.  I think I've only seen

10    this done two or three times.  I've never done it myself.  They

11    gave no notice to Kolon.  They gave no notice to Shinhan when

12    they went into court.  We take issue with and believe that they

13    exaggerated and, in fact, other facts, we think, are just plain

14    false.  But when they made their motion for the temporary

15    restraining order in front of Judge Stein, he granted that

16    motion.

17         Shinhan had all of six days, calendar days, to file

18    its opposition.  By the time we found out about that motion and

19    the order, that relief that Judge Stein had granted, I believe

20    we had two or three business days to respond.  It was clear to

21    us that Shinhan had not engaged counsel.  We didn't even know

22    if they would file opposition.  As it turns out, their

23    opposition consisted of about a two- or two-and-a-half page

24    letter to the Court asking for additional time.  We had no idea

25    whether the Court was going to grant that additional time.  We

C6ceeidc

1    didn't see that letter until we had already prepared and filed

2    with the Court our motion, or our opposition.

3          So those were the circumstances.  We made clear to

4    this court in every appearance, telephonically and in person,

5    in our applications to appear pro hac vice, in our briefs, in

6    every single situation that it was a limited appearance and

7    that we were not submitting the jurisdiction.

8          We disagree about a lot of issues in this case, your

9    Honor.  We do.  But interesting, there are some issues we don't

10   disagree about, and I think they're important ones.  We don't

11   disagree that to find general jurisdiction here in New York,

12   under Section 301, there has to be continuous, systematic and

13   substantial contact.  And I think on the evidence before you,

14   it's clear there isn't.

15         Were this Court to find general jurisdiction over

16   Kolon in New York, here's what it would mean:  It would mean

17   that any plaintiff anywhere in this country, and I would argue

18   in the world, can come to New York and sue Kolon for acts that

19   occurred outside of New York; anywhere in the world, if you

20   find Kolon is subject to general jurisdiction here in New York.

21         So what was Du Pont's proof in its motion of general

22   jurisdiction or specific jurisdiction?  Three things, they

23   argue.  And this is from Mr. Kim's declaration that was

24   attached to their motion.

25         The first was that Kolon USA is a subsidiary of Kolon

C6ceeidc

1   located in New Jersey through which Kolon markets and sells its

2   products in the US, and upon information and belief --

3           THE COURT:   I told Mr. Kim I'm inclined to believe

4   that there is an insufficient showing of jurisdiction over

5   Kolon, general jurisdiction or specific jurisdiction, but I'm

6   inclined to allow discovery.   There is some evidence of

7   activity in New York.

8           There are the existence of the subs.   Whether they

9   rise to the level of sufficient agency is something that I

10  certainly couldn't find in favor of Kolon at this point.   It is

11  odd that a company the size of Kolon with the subs in New York,

12  you know, was not doing business in New York.   But I certainly

13  couldn't find that.   On the other hand, I would be inclined to

14  allow the discovery to go forward to see where the facts indeed

15  lie with respect to that.

16          MR. DASSOFF:   And, your Honor, I understand that.   I

17  understand the Court's comments.   I respect them.   I understand

18  you're trying to do the right thing.   On the other hand --

19          THE COURT:   The right thing is not something out there

20  in the cloud.   The issue is whether on the facts and the law,

21  what is the more correct result?   And there is plain case law

22  with respect to the preliminary showing with respect to

23  jurisdiction.   I don't sit here as some arbiter attempting to

24  do the, quote, right, unquote, thing.   I simply go through the

25  papers and attempt to decide the issues that come before me in

C6ceeidc

1    the most correct way on the facts of the law.  And, you know,

2    I'm here to follow the law.  I don't just attempt to sit and do

3    what I think is, quote, the right thing.

4            MR. DASSOFF:  I meant right procedurally; in other

5    words, giving Du Pont an opportunity, what I will characterize

6    as a second bite at the apple.

7            There are two cases that we've cited, the R-quest vs.

8    Kimberly Carse case and the Stutz case, where the same exact

9    posture that our case is in, the courts found they hadn't

10   presented a prima facie, let alone a substantial case.

11           And Du Pont had every opportunity.  This isn't a case

12   where they just got a judgment and they showed up the next week

13   in court in New York.  They've taken extensive discovery in

14   Virginia post judgment on Kolon's assets so that they should

15   have been fully armed when they came in here.  They've made no

16   showing at all to this Court that there's personal jurisdiction

17   over Kolon here.  I don't think they get another chance.  There

18   are no offices, never have been, for Kolon Industries in

19   New York.  It has no officers, no employees in New York.  Never

20   has.  It's never registered to do business.  It has no license.

21   It has no post office box.  It has no phone number.  If you

22   look up directory assistance or a phone book, you're not going

23   to find its name.  It has no contact with New York, and that's

24   been true forever.

25           So they knew all those things.  And what they gave you

C6ceeidc

1    was a declaration based on information and belief, in two

2    cases, and the third where they tried to argue for specific

3    jurisdiction was the citation to an allegation, conclusory

4    allegation in the complaint.  That's all the evidence they gave

5    you.

6              And the reply didn't add to that, your Honor.  We've

7    given you declarations that are factual.  They're supported,

8    and I think they make it clear that under no circumstances

9    could there be general or specific jurisdiction here in

10   New York.

11             So I would suggest to the Court that much as the Court

12   in R-quest did that on that record, your Honor has more than

13   enough evidence, applying the legal standard that needs to be

14   applied here, to deny this motion.

15             THE COURT:  Okay.  Thank you.

16             MR. DASSOFF:  Thank you, your Honor.

17             THE COURT:  Shinhan?

18             MR. TRACHTENBERG:  Good morning again, your Honor.

19             THE COURT:  Good morning.  Good to see you.

20             MR. TRACHTENBERG:  Thank you.

21             So I ask myself, how much does this Court need to hear

22   about the balancing test in order to --

23             THE COURT:  The answer is I'm inclined to not compel

24   compliance with the subpoena, but I don't mean to cut you off.

25             MR. TRACHTENBERG:  Well, your Honor, needless to say,

C6ceeidc

that will allow me to be much briefer than I might be.  I'll

simply point out a few points very quickly in the effort to

solidify your inclination.

            THE COURT:  In the hope that I don't change my mind

from the time you start to speak and the time you finish?

            MR. TRACHTENBERG:  That's always a risk.

            So I will simply point out that your Honor properly

observed that *Gucci* itself, Du Pont's leading case, makes it

clear that the factors that are -- balancing of the factors

supports the denial of the motion.

            And in particular I would like to just emphasize one

point, which is that the fourth factor provides expressly,

according to Du Pont, that if the information sought can easily

be obtained elsewhere, there is little or no reason to require

a party to violate foreign law.  And I would simply observe

that this is no small matter.

            What Du Pont is asking the Court to do is to require a

nonparty, nonparties to this proceeding, to violate the law of

their home country.  And there's no allegation that these banks

have engaged in any wrongdoing, but Du Pont apparently

considers it not a big stretch for an American court to tell a

party to go and break the law.  And that should only be done

under emergency circumstances.  And for all of the reasons your

Honor has noted, that's not the case here.

            There are ample other alternatives.  And the Court has

C6ceeidc

1    pointed to one this morning, when it observed that there's a

2    very simple solution for Du Pont, which is that it could ask

3    the Virginia court to expressly require that copies of the

4    Shinhan Bank statements and other bank bank statements be

5    produced, together with whatever other information is being

6    produced.

7            *Gucci* makes it clear that --

8            THE COURT:  Kolon suggested to me that many of those

9    statements have been required to be produced already.  I can't

10   tell from what the lawyers have told me what the detail is in

11   terms of actual bank records that have been produced in

12   Virginia.

13           MR. TRACHTENBERG:  Nor do I know whether those records

14   have been produced.  But if they haven't been, Kolon certainly

15   can be ordered to provide them.  So *Gucci* goes with us on that

16   fourth factor.

17           *Gucci* also tells us that the importance of the

18   documents of a particular litigation is vital.  The documents

19   have to be vital to the litigation before a nonparty can be

20   ordered to violate foreign law.

21           Here, as we've indicated in our brief, Du Pont has

22   told the Court that Kolon has billions of dollars available in

23   Korea.  And as your Honor observed the last time we were here,

24   we're talking about $3.5 million or thereabouts that may be

25   located at the Shinhan banks.  And you already determined that

C6ceeidc

1   there's no likelihood of success on the turnover motion.  So

2   the records are only potentially necessary if you change your

3   mind on that score, or if Du Pont goes to Korea to seek

4   enforcement.  And we know from the declaration of Judge Cho

5   that has been submitted that there are proceeds in Korea that

6   are available, and that they include a preattachment freeze to

7   reserve the status quo.

8           THE COURT:  Okay.

9           MR. TRACHTENBERG:  And your Honor has already

10   considered the hardship issue and come down in favor of the

11   banks on that.  So we respectfully request that you not change

12   your mind and that you deny this motion.

13           THE COURT:  Okay.  I'm prepared to decide the motions,

14   but let me first do the attorney admissions.  So the parties in

15   Du Pont are welcome to remain seated at the counsel table or

16   take a break.  This usually takes about a half an hour, maybe

17   less.  So you're welcome to sit there, take a break, relax.

18           MR. KIM:  We'll come back in half an hour, if that's

19   okay with the Court.

20           THE COURT:  Better make it 20 minutes.

21           (Recess)

22           THE COURT:  Okay.  Du Pont.  I'm prepared to decide.

23           The plaintiff, E.I. Du Pont de Nemours & Company,

24   brings three motions in this judgment enforcement action.

25   First, the plaintiff moves for a turnover order against

C6ceeidc

judgment debtor Kolon Industries, Inc. and Kolon Corp

(collectively "Kolon") pursuant to Federal Rule of Civil

Procedure 69(a)(1) and New York Civil Practice Law and Rules,

("CPLR") Section 5225(a).

      Second, the plaintiff moves for an order requiring

Kolon to preserve the status quo with respect to assets held at

certain banks and compelling Kolon to give its written consent

for the banks to comply with subpoena seeking discovery.

      Third, the plaintiff moves to compel discovery from

garnishees Shinhan Bank and Shinhan Financial Group Co.,

Limited (collectively "Shinhan") pursuant to subpoenas issued

pursuant to Rule 45 of the Federal Rules of Civil Procedure.

      The current dispute arises from a civil action brought

by the plaintiff against Kolon Industries, Inc. in the Eastern

District of Virginia alleging misappropriation of trade secrets

and other related causes of action.  Following a jury verdict

in Du Pont's favor, the United States District Court for the

Eastern District of Virginia entered a judgment in favor of

Du Pont against Kolon in the amount of $919.9 million in

compensatory damages and $350,000 in punitive damages.

      On April 10, 2012, that Court granted Du Pont's motion

for permission to register the judgment elsewhere pursuant to

28 U.S.C. Section 1963.  And on April 13, 2012, Du Pont

registered the judgment in this court.

      The plaintiff now seeks to enforce its judgment

C6ceeidc

1    against Kolon.  Kolon Industries, Inc. is a global company

2    based in South Korea that manufactures and markets various

3    industrial materials.  The plaintiff asserts that, following a

4    corporate restructuring, Kolon Industries, Inc. is also known

5    as Kolon Corp. or Kolon Corporation.  The plaintiff thus brings

6    the present motions against both entities, and Kolon has not

7    sought to draw a distinction among those corporate entities for

8    purposes of the pending motion.

9          The plaintiff previously brought two motions directed

10   against garnishee Shinhan:  A motion for a turnover order

11   pursuant to CPLR Section 5225(b) and a motion for a preliminary

12   injunction ordering Shinhan to restrain Kolon's assets.

13         On June 1, 2012, this Court, sitting as Part I, denied

14   the plaintiff's preliminary injunction motion and stayed the

15   plaintiff's turnover motion against Shinhan pending the

16   resolution of the present turnover motion against Kolon.

17         The plaintiff first moves for a turnover order against

18   Kolon.  Under Rule 69(a)(1) a federal district court has the

19   authority to enforce a judgment by attaching property in

20   accordance with the law of the state in which the district

21   court sits.  *Koehler v. Bank of Bermuda, Ltd.* ("Koehler I"),

22   544 F.3d 78, 85 (2d Cir. 2008).  CPLR Section 5225(a) provides

23   that, quote, "where it is shown that the judgment debtor is in

24   possession or custody of money or other personal property in

25   which he has an interest, the Court shall order that the

C6ceeidc

1    judgment debtor pay the money or so much of it as is sufficient

2    to satisfy the judgment to the judgment creditor."  New York

3    CPLR Section 5225(a).

4            The defendant first argues that the plaintiff failed

5    to serve the turnover motion papers on Kolon in compliance with

6    the requirements of the Hague Convention on the Service Abroad

7    of Judicial and Extrajudicial Documents and Civil or Commercial

8    Matters ("the Hague Convention").  However, in connection with

9    the underlying action in the Eastern District of Virginia,

10   Kolon agreed to waive Hague Convention service and stipulated

11   that its counsel would accept service on its behalf.

12   Stipulated Order for Extension of Time, *E.I. Du Pont de Nemours*

13   *& Co. v. Kolon Industries, Inc.*, No. 09 Civ 58 (E.D. Va.

14   February 26, 2009), ECF No. 4.

15           Because this judgment enforcement proceeding is simply

16   a continuation of the underlying action in the Eastern District

17   of Virginia, this waiver of service should remain effective.

18   Moreover, because a turnover proceeding against the judgment

19   debtor under CPLR Section 5225(a), unlike a turnover proceeding

20   against a garnishee under CPLR Section 5225(b), can be

21   initiated by motion and does not require commencement of a new

22   proceeding -- see *Wasserman Media Group, LLC v. Bender*, 10 Civ

23   8783, 2012 WL 1506181 at 2, (S.D.N.Y. April 26, 2012) -- the

24   Hague Convention's service requirements should not apply here

25   in any event.  See *SEC v. Credit Bankcorp, Ltd*, No. 99 Civ.

C6ceeidc

11395, 2011 WL 666158, at 4 (S.D.N.Y. February 14, 2011

(concluding that the Hague Convention "only applies to the

initial service of process, namely the summons, not subsequent

judicial documents" and concluding that service of subsequent

documents need only comply with the Federal Rule of Civil

Procedure 5)(citing *Volkswagenwerk Akiengesellschaft v.*

*Schlunk*, 486 U.S. 694, 700 (1988) (finding that the drafting

history of the Hague Convention "supports our view that Article

I of the convention refers to service of process in the

technical sense")); see also *S&S Machine Corp v. Wuhan Heavy*

*Duty Machinery Tool Group Co., Ltd*., No. 07 Civ. 4909, 2012 WL

958528 at 6 n.11 (E.D.N.Y. January 13, 2012) (same), report and

recommendation adopted in part, 2012 WL 958527 (E.D.N.Y.

March 21, 2012).

       In this case the plaintiff served the documents

relating to the present turnover motion by e-mailing them to

the defendant's attorney and by sending them via express mail

and registered mail, return receipt requested, to Kolon's

headquarters in Korea.  (Kim Reply Declaration, paragraph 5.)

The defendant does not contend that the service was defective

under Federal Rule of Civil Procedure 5 or otherwise defective

apart from the Hague Convention requirements that the defendant

has already waived.  Thus, there is no basis to conclude that

service of the present turnover motion was defective.

       The defendant next argues that the Court lacks

C6ceeidc

1    personal jurisdiction over Kolon in order to issue a turnover

2    order against Kolon pursuant to CPLR Section 5225(a).  This

3    Court must have personal jurisdiction over Kolon.  See, for

4    example, *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951, 2012 WL

5    1681167, at 2 to 3 (S.D.N.Y. May 9, 2012.)

6              In a federal question case involving an out-of-state

7    defendant, the district court applies the forum state's

8    personal jurisdiction rules if the federal statute does not

9    specifically provide for national service of process.  *PDK*

10   *Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997).

11             Here, the statute pursuant to which the judgment is

12   rendered -- 28 U.S.C. Section 1963 -- does not provide for a

13   nationwide service of process; thus, the Court must determine

14   whether New York law allows the exercise of personal

15   jurisdiction, and if so, whether the exercise of such

16   jurisdiction comports with the constitutional due process

17   guarantees.  See *Estate of Unger v. Palestinian Authority*, 400

18   F. Supp. 2d 541, 547 (S.D.N.Y. 2005) (concluding that when

19   enforcing a judgment registered pursuant to 28 U.S.C. Section

20   1963, the appropriate measure of personal jurisdiction is the

21   forum state's long-arm statute).

22             The plaintiff first contends that Kolon submitted to

23   this Court's personal jurisdiction by appearing in the prior

24   turnover proceeding against garnishee Shinhan.  The plaintiff

25   argues that Kolon's appearance in the Shinhan turnover

C6ceeidc

proceeding was functionally equivalent to an intervention which

it contends is fundamentally incompatible with an objection to

personal jurisdiction.  However, under New York law a

non-domiciliary judgment debtor "may protect his interest in

attached property without submitting to false in personam

jurisdiction." *In Re Gaming Lottery Securities Litigation*, No.

96 Civ 5567, 2000 WL 1801840, at 4, (S.D.N.Y. December 7,

2000.)  Section 320(c) of CPLR provides for limited appearances

for defendants contesting levies on their property.  Thus,

Section 320 sanctions the use of a limited appearance and

permits the defendant in a quasi in rem action, such as a

garnishment proceeding, to answer and to protect his interest

in the attached property without submitting to full in personam

jurisdiction and risking a personal judgment. *Cargill, Inc. v.*

*Sabine Trading and Shipping Co., Inc.*, 756 F.2d 224, 228 (2d

Cir. 1985); see also *Gager v. White*, 425 N.E.2d 851, 856, n.10,

(N.Y. 1981) (in a quasi in rem action, "the defendant is

permitted to defend without submitting to in personam

jurisdiction"); *Weininger v. Castro*, 462 F. Supp. 2d 457, 492

(S.D.N.Y. 2006) (characterizing garnishment proceedings as

quasi in rem actions.)  Thus, by entering a special appearance

to oppose the Shinhan turnover motion, Kolon did not submit to

the personal jurisdiction of this Court. See *In re Gaming*

*Securities Litigation*, 2000 WL 1801840 at 2 and 4 to 5

(defendant who opposed turnover proceeding against third-party

C6ceeidc

garnishee under CPLR Section 5225 did not submit to court's
personal jurisdiction).  Indeed, the plaintiff did not return
to this argument in its reply brief.

The plaintiff next contends that Kolon has sufficient
contacts with New York so as to render this Court's
jurisdiction proper.  The defendant contends that no such
context exists, asserting that both Kolon Industries, Inc. and
Kolon Corp. are foreign corporations based in South Korea, and
that neither entity has offices, employees, bank accounts or
assets in New York.  (Jung declaration, paragraphs 10 and 12.)
The plaintiff asserts that this Court has general jurisdiction
over Kolon under an agency theory, because Kolon is present and
doing business in New York by virtue of the activities of its
subsidiaries Kolon USA and Kolon I'Networks.  However, the
parties strenuously dispute the extent to which these
subsidiaries actually conduct business in New York, as well as
the extent to which they carry out the business of and perform
functions for Kolon.

The papers and supporting affidavits submitted by the
plaintiff do not establish that these subsidiaries do "all the
business which Kolon could do were it here by its own
officials," which would be required to conclude that the
alleged agents subjected Kolon to general personal jurisdiction
in New York.  *Frummer v. Hilton Hotels International, Inc.*, 227
N.E.2d 851, 854 (N.Y. 1967).

C6ceeidc

1           The plaintiff has also failed to make a sufficient

2    showing that the Court has jurisdiction over Kolon based on

3    Kolon's own activities.  The plaintiff contends that Kolon

4    itself conducts sufficient business in New York to subject it

5    to general jurisdiction, but the papers and supporting

6    affidavits submitted by the plaintiff do not make clear whether

7    the specific entities with which Kolon conducts business are,

8    in fact, based in New York or elsewhere.  See Kim declaration,

9    paragraph 28, and Exhibit 10; Jung declaration, paragraphs 13

10   and 15.  It is also unclear from the papers submitted whether

11   any of the tortious conduct that gave rise to the underlying

12   judgment in the Eastern District of Virginia occurred in

13   New York, such that specific jurisdiction would be proper under

14   CPLR Section 302(a)(2).

15           The plaintiff has thus made an insufficient showing of

16   personal jurisdiction over Kolon to permit the Court to grant

17   the relief sought.  However, it is appropriate to authorize

18   jurisdictional discovery to determine the nature and scope of

19   Kolon's contacts with New York, if any, and to resolve the

20   disputed factual issues set forth above.  See *Daval Steel*

21   *Products v. M.V. Jurac Dalmatinac,* 718 F.Supp. 159, 162

22   (S.D.N.Y. 1999) (jurisdictional discovery appropriate where

23   plaintiff makes a "threshold showing that there is some basis

24   for the assertion of jurisdiction").

25           Accordingly, the Court will permit the parties to

C6ceeidc

1    engage in jurisdictional discovery for a period of 60 days, and

2    another conference will be scheduled after the conclusion of

3    jurisdictional discovery.  The plaintiff's motion for a

4    turnover order is, therefore, denied without prejudice to

5    renewal after the conclusion of the jurisdictional discovery.

6    The plaintiff's turnover motion in Shinhan will remain stayed

7    during this time for jurisdictional discovery.

8          The plaintiff next moves for an order requiring Kolon

9    to preserve the status quo with respect to assets held at

10    certain banks and compelling Kolon to give its written consent

11    for the banks and comply with subpoenas.  This motion is also

12    denied without prejudice to renewal after the conclusion of

13    jurisdictional discovery because there is an insufficient

14    showing that the Court has personal jurisdiction to enter this

15    relief against Kolon.

16          The plaintiff next moves for an order compelling

17    Shinhan to comply with Rule 45 subpoenas seeking documents

18    concerning Kolon's accounts at Shinhan Bank.  Shinhan asserts

19    that if it complied with the Rule 45 subpoenas, it would be in

20    violation of Korean law, namely, The Act on Real Name Financial

21    Transactions and Guarantee of Secrecy ("the Real Name Act"),

22    which provides, with certain exceptions, that an employee of a

23    financial institution may not disclose any material or

24    information relating to the contents of a financial transaction

25    without the written consent of the parties to the transaction.

C6ceeidc

1    (Cho declaration, paragraph 13.)

2              Where a party from whom discovery is sought asserts

3    that foreign law constitutes a bar to production, courts

4    perform an international comity analysis to determine whether

5    to exercise their power to compel discovery.  In conducting

6    this analysis, courts in this Circuit consider a series of

7    factors set forth in the Restatement (Third) of Foreign

8    Relations Law of the United States.  See, for example, *Gucci*

9    *America Inc. v. Curveal Fashion,* No. 09 Civ. 8458, 2010 WL

10   808639 at 2 (S.D.N.Y. March 8, 2010); *Linde v. Arab Bank, PLC*,

11   262 F.R.D. 136, 149 (E.D.N.Y. 2009).

12             These factors are:  "One, the importance of the

13   investigation or litigation of the documents or other

14   information requested; two, the degree of specificity of the

15   request; three, whether the information originated in the

16   United States; four, the availability of alternative means of

17   securing information; and five, the extent to which

18   noncompliance with the request would undermine important

19   interests of the United States, or compliance with the requests

20   would undermine important interests of the state where the

21   information is located."  Restatement (Third) Foreign Relations

22   Law, Section 442(1)(c).

23             Courts in this circuit also consider "the hardship of

24   compliance on the party or witness from whom discovery is

25   sought and the good faith of the party resisting discovery."

C6ceeidc

*Gucci*, 2010 WL 808639 at 2 (quoting *Minpeco S.A. v.*

*Conticommodity Services, Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y.

1987)).

        Here the balance of these factors weighs heavily

against compelling Shinhan to produce the discovery sought by

the plaintiff.

        First, the parties appear to agree that the documents

originated outside the United States and are maintained in

Korea, which weighs in favor of Shinhan.

        Second, with respect to the competing interests of the

United States and Korea, while the United States has an

interest in enforcement of subpoenas, this interest is

diminished to some extent when, as here, the discovery is

requested by private civil litigant and is sought from a third

party.  See *Gucci*, 2010 WL 808639 at 5; *Tiffany (NJ) LLC v. Qi*

*Andrew*, 276 F.R.D. 143, 157 (S.D.N.Y. 2011).

        Next, with respect to the hardship of compliance,

Shinhan has made a showing that it could face civil and

criminal penalties in Korea if it produces the documents

requested by the plaintiff.  Shinhan submits a declaration from

a Korean lawyer and former chief judge of the Seoul District

Court, who represents that unauthorized disclosures in

violation of the Real Name Act are punishable by imprisonment

for a term of up to five years and fines in amounts of up to 30

million Korean Won or both.  (Cho Declaration, paragraph 13.)

C6ceeidc

1          It is true, as the plaintiff asserts, that some courts

2     have deemed the possibility of hardship to be speculative,

3     whereas here the party resisting disclosure does not cite

4     instances where the sanctions at issue have actually been

5     imposed in practice.  See, for example, *Milliken and Co. v.*

6     *Bank of China*, 758 F.Supp. 2d 238, 250 (S.D.N.Y. 2010); *Gucci*,

7     2010 WL 808639 at 7.  However, this is not a case where there

8     is countervailing evidence that the statute in question was

9     never intended to be enforced in practice.  See *In re Air Cargo*

10    *Shipping Services Antitrust Litigation*, 278 F.R.D. 51, 53 to 54

11    (E.D.N.Y. 2010), or that banks have actually complied with the

12    United States court order compelling production without

13    negative consequences.  See *Tiffany*, 276 F.R.D. at 159.

14         Instead, this is simply a case where the plaintiff's

15    Korean law expert is not aware of a case on point where

16    prosecution under the Real Name Act has or has not occurred.

17    (Jang declaration, paragraph 4.)  Nor is this a case where

18    there are likely to be valid defenses on which Shinhan could

19    prevail if the Real Name Act were enforced against it.  See

20    *Weiss v. National Westminster Bank*, PLC, 2 F.R.D. 33, 56

21    (E.D.N.Y. 2007).

22         Although the plaintiff points out that the Real Name

23    Act has an exception for disclosure pursuant to court orders,

24    Judge Cho asserts that a Korean court is unlikely to recognize

25    an order from a New York court as valid for the purposes of

C6ceeidc

1    this exception, and the plaintiff has not rebutted the showing.

2    (Cho declaration, paragraph 13.)  In addition, Shinhan's

3    "status as a nonparty in this litigation weighs against issuing

4    an order because an order compelling production should be

5    imposed on a nonparty, quote, only in extreme circumstances."

6    *Linde*, 262 F.R.D. at 151 (quoting *Minpeco*, 118 F.R.D. 331, 332.

7    See also *Tiffany*, 276 F.R.D. at 158.  Thus, on balance, the

8    hardship of compliance weighs in favor of Shinhan.  Moreover,

9    there is no showing that Shinhan has acted with bad faith in

10   this matter, which also weighs in Shinhan's favor.

11          Furthermore, there are several alternative means of

12   obtaining the information sought by the plaintiff.  First, the

13   plaintiff could obtain this information directly from Kolon.

14   It could obtain discovery directly from Kolon in the Eastern

15   District of Virginia.  Indeed, Kolon asserts that during the

16   course of discovery it has provided the plaintiff with specific

17   account numbers, deposit balances and the physical addresses of

18   each branch of the Shinhan Bank holding Kolon's property.

19   (Chung declaration, paragraphs 8 to 10.)  The plaintiff does

20   not appear to argue that Kolon has refused to comply with the

21   specific requests for information concerning Kolon's accounts

22   at Shinhan.  The plaintiff also has resorted to the Court in

23   the Eastern District of Virginia if it found the information

24   provided by Kolon relating to Shinhan were insufficient.

25          Second, the plaintiff could proceed directly in Korea,

C6ceeidc

given that Korean law allows judgment creditors to seek

preliminary attachment of freezes against a judgment debtor's

accounts even before a judgment becomes final and

non-appealable.  (Cho declaration, paragraph 11.)  The

plaintiff has made no showing of why these alternative methods

would be futile or unduly difficult, and these methods have the

benefit of avoiding the imposition of hardships on Shinhan, an

innocent third party.  Thus, this factor also weighs against

compelling Shinhan to comply with the subpoenas.

        Furthermore, the documents requested are not vital or

of great importance to this judgment enforcement action, given

Kolon's representations that it has already provided

information about its accounts at Shinhan to the plaintiff.

        Further, as Shinhan points out, Kolon is not a

fly-by-night defendant against whom a default judgment has been

entered but has instead been litigating this case actively in

the Eastern District of Virginia, where it is indisputably

subject to personal jurisdiction.  Thus, this is not a case

where the plaintiff's only tool for enforcing the judgment is

to access the defendant's bank accounts.  See *Gucci*, 2010 WL

808639 at 3.

        Moreover, the amounts in Kolon's Shinhan accounts are

relatively small compared to the amount of the judgment and the

other assets of Kolon potentially available to the plaintiff.

Kolon has informed the plaintiff that it holds approximately

C6ceeidc

$71.3 million in deposits in various bank accounts in Korea,

yet it holds only $3.5 million in its accounts at Shinhan Bank.

Moreover, the 3.5 million is a small fraction of the

judgment sought to be enforced, which is in excess of $920

million.  And it is a very small fraction of the defendants'

revenue and worth.  This weighs against a conclusion that

documents relating specifically to Kolon's assets at Shinhan

Bank are vital to the plaintiff's ability to enforce a nearly

$1 billion judgment.

The remaining factor, the specificity of the

plaintiff's request, weighs in favor of the plaintiff because

the requests are reasonably specific.  However, on balance, the

relevant factors in the comity analysis weigh strongly against

ordering Shinhan to comply with the subpoenas at issue here.

Accordingly, the plaintiff's motion to compel discovery from

Shinhan is denied.

The Court has considered all of the arguments of the

parties.  To the extent not specifically addressed above, the

remaining arguments are either moot or without merit.  For the

foregoing reasons, the plaintiff's motion for a turnover order

against Kolon and the plaintiff's motion for an order

preserving the status quo are denied without prejudice to

renewal after the conclusion of jurisdictional discovery.  The

plaintiff's motion to compel discovery from Shinhan is denied.

The Court authorizes jurisdictional discovery for 60 days.  The

C6ceeidc

1    clerk is directed to close docket numbers 51 and 55.

2              So ordered.

3              All right.  That disposes of all of the motions before

4    me.  Good morning, all.

5              MR. KIM:  Thank you for your time, Judge.

6              MR. DASSOFF:  Your Honor, the Court in its order had

7    mentioned a conference, and I wondered, is that conference one

8    that you want to set a date for or would it be before this

9    Court?

10             THE COURT:  That's a very good question.  I

11   deliberately left out a date for that conference.  The parties

12   should contact the Court and ask for a conference.  Whether the

13   subsequent proceeding should be before me or before the next

14   Part I judge is something that I'm just not clear about, which

15   is why I didn't give you a specific date and say, come on down,

16   come on down before me.  It's a matter I want to think about.

17             So you should contact the Court, and whether that

18   comes back to me or the next Part I judge, whoever the Part I

19   judge is in two months, is an issue to be decided.

20             MR. DASSOFF:  Understood, your Honor.  Thank you.

21             MR. KIM:  Thank you, Judge.

22             MR. TRACHTENBERG:  Thank you, your Honor.

23             (Adjourned)

24

25