D52ddup1
                              Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    E.I. du PONT de NEMOURS AND
     COMPANY,
4
                         Plaintiff,          New York, N.Y.
5
                    v.                        12 Civ. 8435 (AJN)
6
     KOLON INDUSTRIES, INC. and
7    KOLON CORPORATION,

8                        Defendants.

9    ------------------------------x

10                                           May 2, 2013
                                             9:38 a.m.
11
     Before:
12
                         HON. ALISON J. NATHAN,
13
                                             District Judge
14
                              APPEARANCES
15
     KOBRE & KIM LLP
16        Attorneys for Plaintiff
     BY:  MICHAEL S. KIM
17        CARRIE A. TENDLER
          MARCUS J. GREEN
18        KIMBERLY COLE

19   PAUL HASTINGS LLP
          Attorneys for Defendants
20   BY:  MARK D. POLLACK
          DANIEL B. GOLDMAN
21        BENJAMIN M. CUTCHSHAW
          KIMBERLY I. KEPLER
22        K. TRISHA CHANG
          CHRISTOPHER ALLEN
23        JEFF G. RANDALL

24        – also present –

25   Esther Yook, Korean Language Interpreter


                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D52ddup1
                                    Hearing

 1              (Hearing resumed)

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning, everyone.  Please be seated.

 4              OK.  Who would like to tell me how you want to

 5      proceed?

 6              MR. KIM:  Yes, your Honor.  I think I'm happy to

 7      report that counsel have reached a stipulation on much of the

 8      paper that we would have had to burden you with, and so there

 9      are just a few conceptual issues left about some documents we

10      could not sort of get on the same page on.

11              THE COURT:  OK.  If you would, just start -- if you

12      would start by telling me what you agreed to.

13              MR. KIM:  Actually, I will start by sitting down.

14              In terms of what we have agreed to, I think one of my

15      colleagues will cover that as a list.

16              THE COURT:  Go ahead, Mr. Green.  Pull the mic in

17      front of you.

18              MR. GREEN:  K13 is agreed --

19              THE COURT:  So I meant -- I am happy to hear it, but

20      give me the sort of overview.

21              MR. GREEN:  Oh, well, we've agreed on -- we've

22      exchanged a list of exhibits that we would propose be admitted,

23      and we've agreed on the vast majority of them; there remains a

24      few objections.  And then we have stipulations of fact that are

25      finalized enough that we are -- that it can obviate the need

D52ddup1
                              Hearing

1    for additional testimony.

2           And there is essentially two areas -- two large areas

3    of disagreement that Mr. Kim was about to address.

4           THE COURT:  All right.  So in terms of the documents

5    that you've agreed to, give me a sense of the scope of the

6    documents.

7           MR. GREEN:  There are documents that are contracts

8    between Kolon Industries and financial institutions.  There is

9    documents between Kolon Industries and some fashion houses.

10          THE COURT:  Mm-hmm.

11          MR. GREEN:  There are sets of shipping documents that

12   Kolon produced.  There are sets of e-mails between Kolon

13   personnel and these fashion houses reflecting their contacts

14   that they've agreed that we'll move in.  There are some e-mails

15   reflecting negotiations of licensing agreements with fashion

16   houses.  And they have agreed to the demonstrative that

17   reflects the stock ticker symbols, and they have agreed to

18   stipulate that that is accurate.

19          And then we have some stipulations of very small

20   facts -- the status of Cooper Tire as a customer of Kolon as to

21   a certain date, the status of another company called Akro

22   Polychem, who was a customer as of a certain date, the fact

23   that the disputed exhibit yesterday was produced by Michael

24   Ahn --

25          THE COURT:  Mr.  Green, could you pull the mic closer

D52ddup1
                              Hearing

1    and enunciate.

2            MR. GREEN:  Just the fact that the disputed Exhibit

3    130 from yesterday was in fact produced by Michael Ahn from his

4    files; the fact that Kolon USA has not ever had a New York

5    branch office.

6            And then we went through -- we have stipulations that

7    describe the availability of certain promotional materials as

8    of a certain date and their subsequent unavailability as to a

9    date.  And the fact that the websites that are a host of

10   exhibits were actually accessed and exhibits created therefrom

11   on the dates reflected on the documents from the Web address,

12   the URLs indicated on the documents.

13           THE COURT:  All right.  And the documents that you

14   have described that you've got stipulations to that come into

15   evidence, those are just du Pont exhibits, or there are

16   exhibits --

17           MR. GREEN:  There are also their exhibits.

18           THE COURT:  So there is agreement on both sides?

19           MR. GREEN:  Correct.

20           THE COURT:  Is that the pile?

21           MR. GREEN:  We don't have the pile all in place as of

22   yet but we will very shortly.

23           MR. GOLDMAN:  And also, your Honor, we will -- I think

24   it will make sense if you would like one binder of all of the

25   admitted exhibits, would that make sense for the Court?

D52ddup1
                              Hearing

1              THE COURT:  Yeah.  You could, as I said yesterday, in

2     terms of the exhibits themselves, for purposes of moving

3     forward in the future, you all are responsible for them.  It

4     would be helpful to me when we're done and we have agreement on

5     what's come in, agreement between you and verification from us,

6     if I give you back the binders of all of the potential exhibits

7     and you produce to me a binder or two, whatever it looks like,

8     of everything that has come in, that would be helpful, a copy

9     set.

10             So, yes.  OK.

11             MR. GREEN:  Your Honor, do you have a preference for

12    the form of stipulations?

13             THE COURT:  No.  You can put those together in with

14    whatever document you would like.

15             Why don't you, since it doesn't sound overly

16    extensive, go, as you had started to do, Mr. Green, read into

17    the record what documents you've reached agreement on and then

18    we can turn to the points of disagreement.

19             MR. GREEN:  I will read off the du Pont exhibits that

20    we have reached agreement on, and I'll let Dan read off the

21    exhibits from Kolon that are agreed upon.

22             Exhibit 7, Exhibit 21, Exhibit 22, Exhibit 32, Exhibit

23    45, Exhibit 49, Exhibits 55 through 58 and -- I should note

24    that Kolon is persisting in its sort of blanket objection as to

25    the date ranges for relevance -- Exhibit 61, Exhibits 67, 68,

D52ddup1
                              Hearing

1   69 and 70.

2             THE COURT:  OK.  Is that the end?

3             MR. GREEN:  No.  There are only a few more.

4             THE COURT:  Go ahead.

5             MR. GREEN:  Exhibit 107, Exhibits 108 through 118,

6   Exhibit 120, Exhibit 256, and we've agreed to their entire list

7   with the exception of that --

8             THE COURT:  Right.  So before -- I am a stickler about

9   the record.

10            Mr. Goldman, you agree to -- you waive any objections

11  to the admission of the exhibits that Mr. Green just read, with

12  the exception of your standing objection to dates prior to

13  the -- remind me of the date that --

14            MR. GOLDMAN:  With the exception of the dates, we do

15  not have objection.

16            As Mr. Pollack said, we will give the Court a list

17  with the exhibits which we're specifically objecting to on the

18  date issue.

19            THE COURT:  All right.

20            MR. GOLDMAN:  We should have that to the Court today.

21            THE COURT:  OK.  So then without objection, the

22  exhibits that Mr. Green just read and with the noted objection

23  on timing, those exhibits are admitted.

24            (Plaintiff's Exhibits 7, 21, 22, 32, 45, 49, 55-58,

25  61, 67-70, 107, 108-118, 120, 256 received in evidence)

D52ddup1

Hearing

1          THE COURT:  Turning to Kolon's list of stipulated-to

2     exhibits.

3          MR. GOLDMAN:  OK, your Honor.  It is Exhibit K13 --

4          THE COURT:  You could either just say -- you can cut

5     "Exhibit" and give the list.

6          MR. GOLDMAN:  All right.  K13, K14, K40, K41, K42, K60

7     and K61.

8          THE COURT:  OK.  And, Mr. Green, no objection to those

9     exhibits coming in?

10          MR. GREEN:  No objection.

11          THE COURT:  All right.

12          MR. GOLDMAN:  There may be a couple of other exhibits.

13     There are actually K20 to 23, which we have to talk to them

14     about; we did not do that.  But if that is also stipulated to,

15     we will notify your Honor.

16          THE COURT:  Well, OK.  The previous --

17          MR. GOLDMAN:  Sorry, your Honor.  K62, as well, which

18     is our demonstrative, which we'll discuss with du Pont.

19          THE COURT:  I don't have stipulations on those.

20          The previous ones read by Mr. Goldman that there is

21     stipulation on and no objection are admitted.

22          You can bring further ones to me, though the time

23     is -- we are winding down.  I want to close the record when we

24     are done.  I will give you time to sort out the remaining

25     issues.  I should have made you come at 7:30, I guess.

D52ddup1

Hearing

1      (Defendant's Exhibits K13, K14, K40-K42, K60, K61

2  received in evidence)

3      MR. GOLDMAN:  The other issue, your Honor, is that we

4  have now failed to reach a stipulation on Palmer Holland, so it

5  stands now we are going to be going forward with the short

6  testimony of Ed Antonucci tomorrow at 9:30.

7      THE COURT:  OK.

8      MS. TENDLER:  Your Honor, I know Mr. Green had started

9  to read the stipulation.  Just so the record is clear, we

10  will -- there are some language tweaks.  There is agreement in

11  concept on a number of fact stipulations.  We will be in a

12  position to read those as agreed into the record before the

13  record closes.

14      THE COURT:  All right.  Then we'll do that it -- since

15  we are coming in tomorrow for testimony, I'll let you do a

16  final agreement on any remaining documents, exhibits and we

17  could put the stipulations on the record.

18      MR. KIM:  Judge, I do have a suggestion for possibly

19  finishing today, but I did want to point out that this Palmer

20  Holland witness is -- I think he is not a critical witness

21  sufficiently important that we can't just scratch the person

22  off.  It is a witness called by Kolon to rebut, I think, some

23  suggestions that are made by the documents that have been

24  entered into evidence.

25      The point of disagreement is that there are facts

D52ddup1

Hearing

1   showing that this witness and Palmer Holland participated along

2   with Kolon to try to frustrate enforcement of the judgment.

3   This really just goes to the witness' credibility.  And so if

4   the witness, obviously -- if the direct comes in, this comes in

5   as a cross point.

6           Now, what I would like to do, if possible, since we

7   still have to finalize the precise wording of the factual

8   stipulation that you have heard about, and there might still be

9   disagreements there, is maybe just to try to take an hour out

10  now, or at some point today, to try to see if we can just agree

11  on what the direct and cross of this witness would say.  And if

12  that's accepted, then we don't have to have the person here.

13  If we can't agree on what the direct and cross would say, then,

14  unfortunately, we will have to burden your Honor again tomorrow

15  morning.

16          But since the only reason I want to put in the

17  interference with the collection issue is because it goes to

18  this witness' credibility, I think hopefully if they want to

19  put in the direct, then some cross should come in and maybe we

20  can get the record closed today.  That is just my suggestion.

21          THE COURT:  Other than is it Palmer Holland, in light

22  of the other stipulations that you've already reached, no

23  further testimony is necessary for either side?

24          MR. POLLACK:  Judge, there is a translation issue,

25  regrettably, that was brought to my attention this morning that

D52ddup1
                              Hearing

1    may require actual testimony.

2            THE COURT:  You have competing translators?

3            MS. TENDLER:  No.

4            MR. POLLACK:  Well, I will speak with counsel since

5    she tells me the answer is no.  We are relying on a translation

6    that they provided to us; they are relying on an inaccurate

7    translation that we provided to them, and we're trying to find

8    common ground.  As of now we haven't.  If we can't, we are

9    going to have to somehow prove what the actual Korean language

10   says.

11           THE COURT:  Well, the only way I could -- I speak some

12   Japanese.  Korean, I've got none.  Obviously, all I can do is

13   hear from a qualified translator and be informed.

14           MS. TENDLER:  Your Honor, my understanding of the

15   issue, because- I think it is actually a little simpler than

16   competing translations -- Mr. Ahn produced two different

17   documents from his file.  One is a Korean language document

18   which, based on a certified translation which we had produced

19   and which I don't think is in dispute, says one thing, and he

20   also produced an English version of that document from his own

21   files.  Now, we're obviously taking the position that the

22   certified translation is what it is and that the English

23   document that Mr. Ahn had in his own files is what it is.  We

24   are not offering that as a competing certified translation.  We

25   told counsel that this morning.  So.

D52ddup1

Hearing

1          MR. POLLACK:  The issue is -- first of all, Kolon

2     provided Mr. Ahn with that translation.  If we need to get into

3     this, we will have to recall Mr. Ahn to go through these facts,

4     your Honor.  But the issue is a seminal issue that is directly

5     relevant to their case because the mistranslation involves the

6     number of offices in New York --

7          THE COURT:  Look, there is nothing in front of me to

8     decide at the moment.

9          MR. POLLACK:  Right.

10          THE COURT:  We are wasting my time, your time.

11          It sounds like you need some -- this isn't going to be

12     an endless process, folks.  I am going to give you an hour.

13     Work out what you work out.  If you don't have it worked out,

14     you put on testimony, you put in evidence.  That is the way

15     this goes.  It doesn't go on forever.

16          So work it out or present evidence.

17          MR. KIM:  There is one final issue, Judge, before we

18     are made to hopefully get this record closed today.

19          There is I think some confusion, and we tried to work

20     it out but I think ultimately we need either you to say

21     something or we both need to say something on the record.

22     There are a category of documents that currently have exhibit

23     stickers on them but they probably shouldn't and these are

24     judicial -- what I'll call judicial materials.  There are

25     opinions from the Eastern District of Virginia.  There are

D52ddup1

Hearing

1  transcript excerpts of what counsel have said in proceedings

2  here and in the Eastern District of Virginia.  And there is

3  also a document request that was served in this case.  And

4  those are the materials we're talking about; there is a

5  handful.

6          Now, what I had hoped would be -- and I think

7  consistent with something your Honor said yesterday was that

8  materials like this, if parties want to cite them as part of

9  their briefing and point your Honor to particular documents

10 like this that are judicial materials, they can do it, and you

11 can decide to disregard it if you think it is not relevant to

12 your decision.

13         If that understanding is clear, then we were not

14 actually going to offer these types of things in evidence.  I

15 don't think these are really evidentiary materials.

16         I think what --

17         THE COURT:  You are saying these are judicially

18 noticeable, is that --

19         MR. KIM:  Yes.

20         THE COURT:  So is that contested?  I mean, you've

21 described a category -- a couple of categories.

22         MR. KIM:  Right.

23         THE COURT:  If you are asking me to make a blanket

24 ruling on whether --

25         MR. KIM:  No, I am not asking you to make a ruling,

D52ddup1
                              Hearing

1    your Honor.

2              THE COURT:  OK.

3              MR. KIM:  But I think -- so we were trying to work

4    this out, and I believe that the Paul Hastings' guys also were

5    just genuinely trying to make sure that they don't end up kind

6    of giving away some right that is going to come back to haunt

7    them later.

8              I think the confusion arises from whether your Honor

9    would wish materials like this to actually be put into the

10   record at this proceeding, or we could just kind of cite these

11   later and we could, you know, obviously in the briefing argue

12   to your Honor that you should disregard this or disregard that,

13   but that the failure to put in items from these judicial

14   proceedings or that what we say are judicially noticeable in

15   these proceedings -- like, you know, the document requests in

16   this case or a judicial opinion from the Eastern District of

17   Virginia -- that that failure to enter into evidence is not

18   going to be some kind of bar to your Honor considering it.  I

19   realize that you got dropped in the middle of this and there

20   was a lot of litigation that has gone on beforehand.

21             So I think if your Honor has a view about it, I think

22   it would help us in our discussion in the next hour.  Maybe we

23   can just come to a stipulation about it.  If not, since I'm not

24   asking you for a ruling, I am not asking necessarily for a

25   reaction, but that is the issue.

D52ddup1
                              Hearing

1          THE COURT:  Does anybody want to speak to it?

2          MR. GOLDMAN:  Yes.  I think counsel agrees that these

3    materials are not properly admissible as evidence, and so I

4    think it comes down -- I mean, our objection to a lot of this

5    is it's just highly irrelevant and very, you know, prejudicial

6    in a 403 sense to basically relitigate issues that took place

7    in the Eastern District of Virginia.  I mean, they want to put

8    in very large opinions and things that were from evidentiary

9    hearings in Virginia, and we have a limited amount of briefing

10   here.

11          And I'll give you an example.  They want to put in a

12   finding after an evidentiary hearing of spoliation on one

13   particular category of documents that Judge Payne found.  It

14   was contested.  I believe it was appealed.  There were days of

15   testimony.  There were experts.  The significance of it is

16   mind-blowingly complex, particularly for someone like me who is

17   not technical, and we are just going to go on this rabbit chase

18   in our briefing having now to get into this stuff.  And it

19   would basically eat up our page limits here because they are

20   sort of lobbying it in at the last minute and saying, oh, by

21   the way, we are not going to put evidence on, we don't have any

22   documents, we have no proof because Judge Payne had a finding

23   in Virginia is basically what their argument is.  I just think

24   it is not in this hearing.

25          MR. KIM:  Judge, let me do this because I don't think

D52ddup1
                                    Hearing

1    it is fair for us to just have these abstract debates in front

2    of you.  Let me give you the four exhibits at issue, and then

3    you can take a look at them maybe while we spend our hour to

4    try to see if we can get --

5              THE COURT:  This is the limit of the scope you are

6    talking about?

7              MR. KIM:  Yes.

8              THE COURT:  So you want these four in as part of the

9    record, and you object on relevance grounds?

10             MR. GOLDMAN:  We object on relevance grounds and --

11             THE COURT:  Just to be clear, that is what we talking

12   about?  We are not talking about am I giving you carte blanche

13   to open it up to, you know, whatever Judge Payne's file looks

14   like in this case?

15             MR. KIM:  Sorry.  I am reminded there are actually

16   five.  One is a transcript.

17             I guess I am trying to move it into evidence.  I

18   think, frankly, it would not be fair to opposing counsel if I

19   enter these into evidence and I start making arguments from

20   them.  To the extent they have other judicially noticeable

21   materials that they think were above what I have to say, I

22   think they should be allowed to bring it to the Court's

23   attention.

24             That's why I just don't think it is an evidentiary

25   issue.  It is just that we just couldn't get a commitment that

D52ddup1
Hearing

1   it is not an evidentiary issue.  So I am just going to hand

2   them up.  Maybe while we hash things out for the next hour, you

3   can see whether you want them.

4              THE COURT:  It is like a whole transcript, or this is

5   a particular finding or what?

6              MR. GOLDMAN:  Could we get copies of those, too,

7   counsel?

8              MR. KIM:  I thought I gave them to you.

9              MR. GOLDMAN:  I don't think so.

10             MR. KIM:  We will give it to you afterwards.  Let me

11  just give you a set.

12             No.  For each of these it is really like one line or

13  one paragraph.  I will just walk you through it and maybe that

14  will help.

15             THE COURT:  Why don't you highlight.

16             MR. GOLDMAN:  Your Honor, I think I'm having trouble

17  with the sound now, too.  I missed what counsel said.

18             Are they now trying to move these into evidence?

19             MR. KIM:  No.

20             THE COURT:  He is not.  That was my interpretation.

21  He is not trying to move these into evidence.  I think he wants

22  permission to be able to cite to them in the papers without

23  having moved them as part of the record.

24             Is that a fair --

25             MR. KIM:  Yes.

D52ddup1
Hearing

| | |
|---|---|
| 1 | THE COURT:  All right.  And I'm asking him just to |
| 2 | highlight specifically what it is that he might want to cite. |
| 3 | MR. KIM:  There are five things. |
| 4 | THE COURT:  OK. |
| 5 | MR. KIM:  So I guess I have your exhibit back. |
| 6 | THE COURT:  Let's bracket it for a moment.  You can |
| 7 | give it to my staff to look at.  But it is a couple of |
| 8 | memorandum opinions and a transcript? |
| 9 | MR. KIM:  Right. |
| 10 | THE COURT:  And -- |
| 11 | MR. KIM:  And it is really like a paragraph from each |
| 12 | of these documents. |
| 13 | THE COURT:  OK.  I would like to see specifically what |
| 14 | it is that is in issue. |
| 15 | MR. KIM:  Yes. |
| 16 | THE COURT:  All right. |
| 17 | MR. KIM:  I could walk you through it now or tab it |
| 18 | and give it to you and -- |
| 19 | THE COURT:  Tab it and give it to me. |
| 20 | Well, tab it.  Show it to them.  Maybe you can agree. |
| 21 | And then if you can't I will let you know. |
| 22 | What I'll -- so you've got a few more exhibits that |
| 23 | you need to work through and a few more stipulations that you |
| 24 | need to work through.  And other than that -- |
| 25 | MR. KIM:  Just this Palmer Holland guy. |

D52ddup1
                                    Hearing

1           THE COURT:  And then Palmer Holland, which maybe you

2   could work through and, if not, we will do tomorrow morning.

3   Otherwise, everybody is done with witnesses and that's it?

4   We've now described the scope of the record.  OK.

5           All right.  I asked my -- after I got off the bench

6   last night I thought -- I think my clerk communicated the

7   e-mail.  I thought it would be useful to have not a full -- I

8   know if I say I wanted a full closing today, you would say not

9   today, Judge, give us time, and then it would be not that

10  useful to me because it would be after now and it would be

11  before the briefing comes in.  My request was to think about a

12  very truncated, just while it is still fresh in my mind,

13  limited to a half an hour a side, summation, and then I will

14  let you put your briefing in and then I will bring you back for

15  argument on the briefing.

16          Everyone prepared to go forward with that?

17          MR. KIM:  Yes.

18          THE COURT:  And I would like to do that today even if

19  we might be bracketing -- well, you will know when I come back

20  whether -- but even if you are bracketing testimony for

21  tomorrow, we are still going to do that today.  OK?

22          All right.  Anything else before I step off and get

23  some other work done?

24          (Pause)

25          MR. POLLACK:  Not from us.


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

308

D52ddup1

Hearing

1          THE COURT:  OK.  I will plan to be back in an hour.

2   If you need more time than that, that's fine.  I think the

3   courtroom is clear until this afternoon.

4          Right?

5          THE CLERK:  Mm-hmm.

6          THE COURT:  Just give us time to get me and the court

7   reporter.  I will assume it will be about an hour, but if you

8   need more than that, let me know.

9          THE CLERK:  All rise.

10          (Recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Please be seated.  Okay.  Who will I hear

3     from?

4          MR. KIM:  Mostly me, Judge, and I think there are some

5     issues one of my colleagues will speak to.

6          So I'll just try to play traffic cop on the

7     outstanding issues.  I think the first is this issue about

8     these two documents from Mr. Ahn's files, the translation

9     issue.  I believe that is resolved.  I will let my partner --

10         MS. TENDLER:  Your Honor, that is resolved.  The

11    parties agreed to language.  It is being typed up so we can

12    read it to the record without scribbles and colors.  We expect

13    to be able to do that perhaps as soon as the next 15 minutes.

14         THE COURT:  Okay.

15         MR. KIM:  The second issue was the subject of these

16    what we call judicial documents we have given the court.

17         THE COURT:  Yes.

18         MR. KIM:  What counsel thought to propose was that

19    when we each file simultaneous post-hearing briefs, that if

20    Kolon's counsel believes it is necessary on the same due date

21    as the reply brief, they can make a separate motion to strike

22    any of these documents that they believe is inappropriate.

23         Then if they choose to do that, then just we be given

24    just one response brief to that motion which they may or may

25    not make.

D52JDUP2                          Hearing

 1          THE COURT:  It sounds like it may be not necessary

 2     expenditure of resources.  Why don't we talk about it.  I

 3     assume the discussion is limited to what you have given me, we

 4     are not talking about anything beyond that?

 5          MR. KIM:  Yes.

 6          THE COURT:  So let's start.  One is what is marked as

 7     Exhibit 245 which is plaintiff's first request for the

 8     production of documents in this matter, right?

 9          MR. KIM:  Correct.

10          THE COURT:  You want noticed the fact that you made

11     Document Request No. 9?

12          MR. KIM:  Correct.

13          THE COURT:  All documents and communications

14     concerning sales and marketing, marketing, planning,

15     benchmarking, strategic planning and budgeting in relation to

16     the United States, North America in relation to the U.S.

17     businesses.

18          MR. KIM:  Correct, and that no brochures were produced

19     in response.

20          THE COURT:  I don't have that in front of me.  I would

21     allow notice of the fact that this was a document request made.

22     Any objection to that, Mr. Goldman?

23          MR. GOLDMAN:  I don't think there is an objection to

24     notice this was, in fact, a document request.  We object on

25     relevance basis that whether or not there was a document

1     request made is not at all relevant to this Court's

2     determination.

3            Again I have said this many times in this proceeding,

4     if they want to take up discovery issues, they should have made

5     a proper motion to compel and we should have dealt with it and

6     it should have been resolved.  If it hadn't been, they could

7     have made the motions.  The appropriate motion to somehow

8     documents weren't produced to which they had a request is not

9     appropriate and it is a waste of everybody's time and judicial

10    resources.

11           MR. KIM:  I am not trying to make a belated discovery

12    motion.  In the motion papers or post-hearing papers I would

13    have just put in this along with an attorney affidavit or we

14    could work it into a stipulation now, simply saying that

15    brochures were not produced.

16           From that I am really arguing an inference that is a

17    rebuttal to their argument that Kolon Industries has really

18    nothing to do with New York, never held itself out as being in

19    New York and so forth.

20           Our Exhibits 74 and 75 that we got from third parties,

21    frankly we didn't move to compel because there is --

22           THE COURT:  Here's the problem as I see it, Mr. Kim.

23    We know how litigation works.  Document requests get made.

24    Sometimes they're responded to fully.  Sometimes things aren't

25    found, sometimes parties disagree as to whether the terms mean

1   the same things.

2            All of that gets funneled through a discovery process

3   and then something is done to either say they've given us

4   everything or they haven't, and to the extent that there is

5   something that they don't have here, they haven't given us

6   here, what the repercussions are.

7            MR. KIM:  They say they produced everything they have.

8   I am not saying they're hiding it.  I am just saying they

9   didn't produce it.

10           THE COURT:  You're not saying they're hiding it?

11           MR. KIM:  I don't think they're hiding it.  I don't

12  think that is a fair inference for me to draw from the fact

13  they didn't produce it.  I don't have evidence they have these

14  things today or that Paul Hastings didn't produce it

15  improperly.

16           My assumption is that Paul Hastings asked their

17  client, as they told me that they asked their client to produce

18  whatever they had.  Their client gave them the things.  We got

19  it.  It didn't include the brochures.  I think it is a fair

20  inference their client didn't have the brochures any more.

21  That can be an inference from it.

22           I simply want to establish factually this was asked

23  for and Kolon Industries did not produce anything.

24           THE COURT:  I'll take notice of the fact you made this

25  document request in this proceeding.

1            MR. GOLDMAN:  Your Honor, if necessary, which is what

2     I want to avoid, we may have to respond and put this in context

3     and back-and-forth, what was agreed to and produced.  We should

4     be doing this in our briefing.  We just said he doesn't

5     contest, he doesn't know whether or not we had it.  They asked

6     for it.  It wasn't produced.  If something is not in the

7     custody, possession and control of the company at the time of

8     production, I don't see what the issue is, quite frankly.

9            THE COURT:  I have made my statement.

10           How you all want to spend what pages I am going to

11    give you, which it is getting smaller as we speak, that is up

12    to you.  To the extent that you're relying -- this is going to

13    be a closed record in terms of factual reliance.  Anything that

14    I'm going to make a factual finding on is going to be in this

15    record.  That at least I can have control over, and then what

16    you do with you your pages is up to you.

17           You gave me what's marked as 246, which is a 91-page

18    memorandum opinion in the Eastern District of Virginia

19    litigation, opinion by Judge Payne.  You didn't identify any

20    particular passage.

21           MR. KIM:  No.  It is really not a piece of evidence

22    per se.  It is really just the fact it was issued, and the

23    relevant inference here is that from the absence of the

24    documents, the brochures that we're concerned with, one could

25    infer really two things:

D52JDUP2                         Hearing

1          One could infer that Kolon, which there has been a

2     judicial finding it engaged in systematic document destruction,

3     did it in this case, or it may just be innocent that Kolon just

4     in the ordinary course didn't keep these things.

5          I think I am entitled to argue both that the fact

6     there is a judicial opinion that they've engaged in this

7     conduct in this same case makes it more likely that they did it

8     with respect to the brochures.

9          I am also entitled to argue that Kolon, having

10    received this opinion detailing the consequences of document

11    destruction, the fact that they might have still engaged in it

12    would also be relevant to the credibility of the one industry's

13    business.  The actual statements in it are really not relevant

14    to this case.  I wanted to be able to argue the fact that

15    spoliation opinion was issued, and there is a fair inference

16    since this is a judicial finding, the same defendant that

17    engaged in this conduct now is saying that these documents were

18    not available for production, that it makes it more likely

19    there is inference of misconduct as opposed to innocent

20    mistake.

21         I am not sure why this needs to be entered as an

22    exhibit.  I can cite to any rulings or precedence without

23    marking any one of them as exhibits.  Because there was

24    confusion back-and-forth on counsel, I want to mark it to be

25    safe I am going to cite, there is no statement in it I am going

 1    to cite and say it is -- sorry?

 2              MR. GOLDMAN:  Judge, a couple of things.  A little

 3    background on this.  This was an order that was issued by Judge

 4    Payne relative to documents that concerned one product out of

 5    the hundreds, the many products Kolon Industries made in which

 6    there is a finding that Kolon Industries, before the Eastern

 7    District of Virginia litigation was filed in 2009, destroyed

 8    documents, deleted documents.  It was extensively litigated.

 9    There was an evidentiary hearing.

10              These documents, to the extent they don't exist, would

11    all be relevant because they're 2009 and before.  They don't

12    relate to the relevant date here and they only relate to one

13    product out of many of Kolon's products.

14              Second, the idea they could take this ruling and take

15    a tremendous leap and say to this Court, without knowing the

16    facts and being involved in evidentiary hearing, without any

17    motions in this Court for a motion to compel, can make an

18    adverse inference that Kolon has withheld or destroyed

19    documents is really, quite frankly, beyond outrageous.  I don't

20    use that term very often in argument before courts, but it is.

21              It is absolutely outrageous to think they can seek an

22    adverse reuling in this case before they in this case never

23    made a motion to compel, never made a motion for discovery, and

24    here at the last minute they're making this argument, which is

25    an entirely new argument at closing.

1            THE COURT:  I agree with you, Mr. Goldman.  I will

2    notice the fact this opinion issued, judicially noticeable

3    fact.  I can't stop you from citing an opinion if you think it

4    is persuasive law, but clearly I am not sure of the relevance.

5            Even to get to a point of relevance, you need there to

6    be indisputable fact from here from which I could notice, and

7    not a disputable fact, but an indisputable fact.  So I'll take

8    notice of the fact that this opinion issued.

9            There's a transcript from this proceeding in front of

10   Judge Koeltl in which you point to a passage by Mr. Dassoff.

11   He was someone representing Kolon.

12            MR. KIM:  Yes, your Honor.  We can skip this one.

13            The reason I had marked it back when we were marking

14   things to be safe was that there is a statement where he

15   says -- this is another person at Paul Hastings who was

16   involved in the prior proceeding -- there are no offices, never

17   have been for Kolon Industries in New York.  It has no

18   officers, no employees in New York, but never has.  It has

19   never registered to do business.  It has no license, blah,

20   blah, blah, blah, and it says it has no contact with New York

21   and that has been true forever.

22            Obviously, subsequently we learned Kolon Industries

23   actually was registered here for something like 20-something

24   years and apparently had an office here.  Nobody knows if that

25   was another one of these pretend offices or actually a real

 1    office.

 2              THE COURT:  You want me to take counsel's statement

 3    pre, the beginning of this proceeding --

 4              MR. KIM:  No.

 5              THE COURT:  I was going to make an offer.  I will hold

 6    you to your previous arguments.

 7              MR. KIM:  No.  I think the truth here was -- I don't

 8    know what the deal was in the 70's and 80's, maybe they had an

 9    office.  Nobody can know that now.

10              Most likely, they didn't have an office.  This was

11    actually something I had marked because there was an issue of

12    evolving positions, frankly, on both sides because there was

13    confusion whether, in fact, various Kolon entities really had

14    an office here or was just pretending.  This is going to be

15    relevant to the frame of argument.

16              If it becomes relevant, I will cite it.  It was in a

17    transcript of a prior proceeding.  I don't think it needs to be

18    marked as an exhibit or entered as evidence.

19              THE COURT:  Well, it will not be.

20              Then there is what is marked as 249, which is also an

21    opinion by Judge Payne, and you have marked a footnote about

22    how the parties defined Kolon Industry entities in that

23    litigation.

24              MR. KIM:  Yes.  This actually is more in the vein of

25    citing case law or citing law of the case.  I know it is not

D52JDUP2                      Hearing

1    exactly the same case.

2              THE COURT:  It is not, it is not law of the case.

3              MR. KIM:  It is collateral estoppel.

4              THE COURT:  You want to make an estoppel argument?

5    That is a different theory.

6              MR. KIM:  It is for our briefing down the road, but

7    the reason I cite this is because if your Honor recalls, there

8    was an argument made to your Honor when we were first here

9    talking about scheduling when we first came here,.

10             THE COURT:  That was only yesterday, wasn't it?

11             MR. KIM:  It seems like so long ago.  There was an

12   argument by counsel for Kolon that basically it was clear the

13   judgment debtor, the relevant entity your Honor has to make

14   this agency analysis of for your jurisdictional decision, is

15   clearly just a company called Kolon Industries, Inc. today.

16             There was an argument made, and I have the transcript

17   here if you are interested in the exact words, that du Pont

18   should have made a motion for substitution and did not and now

19   has to live with the consequences, i.e., that somehow in the

20   Eastern District of Virginia the actual judgment debtor is the

21   new Kolon Industries.

22             This exact same argument was attempted before Judge

23   Sweet just earlier, the same day, exactly saying the same thing

24   that du Pont failed to make a motion for substitution of

25   parties; and, therefore, the court, in making its

D52JDUP2                        Hearing

1    jurisdictional decision, should not be looking at Kolon

2    Corporation because no motion for substitution was made by du

3    Pont.

4            Well, Judge, I think this, the footnote in Judge

5    Payne's opinion makes it completely plain this is actually a

6    perversion, complete reverse perversion of what, in fact, was

7    Judge Payne's observation in the case he presided over.

8            He makes clear in the footnote because Kolon never

9    made a motion for substitution of parties, merely sending out

10   some kind of public notice saying now only the new Industries

11   is liable, that is what they did after the restructuring.  One

12   of the exhibits we'll show you is that Kolon declared to the

13   world only the new Industries is liable on this judgment

14   essentially.

15           Judge Payne makes the observation no matter what you

16   announce, under Rule 25 Kolon has to make a motion for

17   substitution, and if it does not, the judgment debtor remains

18   the same defendant who was sued, which is as far as Judge Payne

19   is concerned, Kolon Industries, Inc.  Whether it has renamed

20   itself "Corporation" or something else is irrelevant.

21           I think this is fair rebuttal to I think the argument

22   that has now been attempted before you and Judge Sweet, that

23   you are not to consider Kolon Corporation the judgment debtor

24   because of some type of failure of motion for substitution by

25   du Pont in Virginia and, therefore, the only debtor is the one

1    they want it to be.

2            So because there is a fairly large record here and in

3    Virginia, I didn't want to point your Honor to the specific

4    passage and specific observation of Judge Payne.  Again this

5    isn't in the nature of evidence.  I don't feel it needs to be

6    marked or entered as evidence.  I can cite rulings of other

7    judges that preside over related issues and your Honor can

8    consider them however relevant it is to your decision.  That is

9    why I was marking this and bringing it to the court's

10   attention.  I just couldn't get a commitment from counsel that

11   they would consider this not arguable unless entered into

12   evidence or so forth.  That is why I am marking it.  It is

13   really a legal argument.

14            MR. GOLDMAN:  Your Honor, quite frankly, I am having a

15   hard time understanding what Judge Payne is saying here.  It is

16   complicated and it is in the context of a discovery dispute.  I

17   think that this whole issue of Industries and the Corp., new

18   Industries and old Industries, I am not sure it is a huge issue

19   for this hearing.  For Kolon's sake, hopefully it won't be a

20   big issue in the future, but I don't really think it has a lot

21   of relevance for this proceeding, this particular footnote.

22            They've made their arguments on the record, the

23   difference between the new Kolon Corporation and the old Kolon

24   Industries and what the new Kolon Industries means.  I don't

25   think they need this in the record.

1            THE COURT:  I don't actually know what this, I don't

2    know what it means.  You're not saying as a matter of

3    preclusion I am somehow bound to reach this?

4            MR. GOLDMAN:  No.

5            THE COURT:  I don't know if this is a factual

6    conclusion in here or legal conclusion.

7            MR. GOLDMAN:  I am not arguing that.  I am rebutting

8    what you were told, because of du Pont's failure to file a

9    motion for substitution, the only debtor you can consider is

10   this new Industries entity they're pointing to.

11           THE COURT:  To the extent that this is an opinion you

12   want to cite me because you're not saying it is an estoppel

13   issue, I am not bound, there is not a finding here by which

14   Kolon is bound or I'm bound to follow, you think there is

15   something persuasive here to point me to?  I don't think I can

16   stop you from doing that.  This is not in as an evidentiary

17   matter.  You made an argument it comes in as an evidentiary

18   matter.

19           I don't think I can prevent you from citing this

20   opinion if you think it is persuasive.  Again, so we know what

21   we are talking about, it is Footnote 1 of Judge Payne's October

22   5th, 2012 opinion.

23           MR. KIM:  Footnote 4.

24           THE COURT:  I am sorry.  Footnote 3, actually.

25   Footnote 3 on Page 10 is what was tabbed.

D52JDUP2                          Hearing

1              MR. KIM:  No.  It should have been Footnote 4, Page

2        12.

3              THE COURT:  Maybe that is why I didn't understand it.

4              MR. KIM:  That is why it was extremely confusing.

5              MR. GOLDMAN:  Judge, I was handed a document with a

6        post-it and arrow next to Footnote 3.

7              MR. KIM:  Sorry.

8              MR. GOLDMAN:  That is why I was puzzled.

9              MR. KIM:  It is a clerical mistake on our part.  Take

10       a moment to read Footnote 4.

11             (Pause)

12             THE COURT:  It is more comprehensible to me now.

13             MR. GOLDMAN:  I think my same comments apply.

14             THE COURT:  And my same conclusion.

15             Now again just so the record is clear, since we have

16       agreed that this is the limit of what we are talking about, I

17       am not admitting this into evidence, but to the extent that du

18       Pont thinks there is some relevant, persuasive legal conclusion

19       here that they want to point me to, obviously I would take a

20       look at that if that's how you want to use your time.

21             Then the last is a transcript in front of Judge Payne

22       from April 26, 2013.  It is several pages of discussion between

23       Judge Payne and Mr. Cannard, who also represented Kolon, about

24       whether a litigation hold should be in place and what the

25       extent of it is.  What is it you want me to do with this?

D52JDUP2                          Hearing

1          MR. KIM:  Nothing, Judge.  I think we can move on.

2          THE COURT:  Thank you.  All right.  What else?

3          Further agreements between the parties?

4          MR. GOLDMAN:  Your Honor, I believe we're close on

5     Palmer Holland.  If du Pont will agree with me, I think it has

6     come down to a very short relevance argument on three exhibits

7     they want to admit with respect to Palmer Holland.

8          MS. COLE:  I have actually narrowed that further for

9     you.  I am going to limit our disagreement over the remaining

10    exhibits to just Exhibit 96 with respect to the Palmer Holland

11    issue.

12         MR. GOLDMAN:  So the bottom line then is that we have

13    agreed on stipulated facts.  We have agreed to the admission of

14    certain exhibits.  The sole dispute is on the admissibility of

15    Exhibit 96?

16         THE COURT:  Let's put the remain stipulated-to

17    exhibits on the record first.  If you would, first of all, I

18    don't know that we have your name.  I am going to ask you to

19    sit, as with everyone, and pull the mike to you.  Otherwise, we

20    can't hear you.  Since that is why we're here, it seems

21    important.

22         MS. COLE:  Better, your Honor?

23         THE COURT:  It is.

24         MS. COLE:  There are two exhibits.

25         THE COURT:  Who are you?

D52JDUP2                        Hearing

1              MS. COLE:  Kimberly Cole.  There are two proposed

2    exhibits we have agreed on and we would like to move into

3    evidence now.

4              THE COURT:  Okay.

5              MS. COLE:  The first has been premarked for

6    identification as Exhibit 96 and I guess will come in as

7    Exhibit 96.  I have that here.  It is stickered and I have

8    copies for the court.

9              The second would be Exhibit 261.  We have premarked

10   that.  I believe that, unfortunately, the copies have been left

11   in the witness room, but I can grab them.

12             THE COURT:  As to 96 and 261, without objection?

13             MR. GOLDMAN:  I think there was 97 and 251.

14             MS. COLE:  Sorry, 97 and 261.

15             MR. GOLDMAN:  261 or 51?  I am sorry.  It is 97 we

16   don't object to.  I am still waiting, 251 or 261?

17             MS. COLE:  I believe it is 261.

18             MR. GOLDMAN:  The newly-marked?

19             MS. COLE:  Newly-marked exhibit.

20             MR. GOLDMAN:  No objection, your Honor.

21             THE COURT:  All right.  97 and 261 are admitted.

22             (Plaintiff Exhibits 97 and 261 received in evidence)

23             THE COURT:  Any other exhibits to come in?  I know we

24   have one in issue.

25             MR. GREEN:  In their case 62 is in without objection.

1  It is a demonstrative just for the record.  .

2           THE COURT:  Is there anything else you want to move,

3  Mr. Goldman?

4           MR. GOLDMAN:  Yes.  We move K62, the demonstrative

5  exhibit into evidence.

6           THE COURT:  Without objection?

7           MR. GREEN:  Without objection.

8           THE COURT:  K62 is admitted as a demonstrative.

9           (Defendant Exhibit K62 received in evidence)

10          THE COURT:  That is it for stipulated-to exhibits?

11          So then we have got dispute on relevance on one

12 exhibit.

13          MR. GOLDMAN:  Excuse me, your Honor.  If we can get

14 counsel from du Pont to tell me what the exhibit number of the

15 disputed exhibit is again?

16          MS. COLE:  96.

17          MR. GOLDMAN:  We don't object do 96.

18          THE COURT:  All right.  Plaintiff's 96 is admitted.

19          (Plaintiff Exhibit 96 received in evidence)

20          THE COURT:  Then stipulations?

21          MS. COLE:  I have one thing, I beg your Honor's

22 indulgence on the Palmer Holland stipulation.  In fairness to

23 opposing counsel, I didn't have a moment to ask you before we

24 came in the courtroom.  We would like to add two things to the

25 stipulation.  I don't think there are --

D52JDUP2                            Hearing

 1              THE COURT:  I understood we weren't ready on Palmer

 2     Holland.

 3              MR. GOLDMAN:  Where we stand on written stipulations,

 4     we will get all of them to the court in writing today after

 5     argument.

 6              THE COURT:  That is fine.  I will just mark them as a

 7     court exhibit and then I'm comfortable putting them in that

 8     way, okay?

 9              MS. COLE:  Thank your Honor.

10              THE COURT:  All right.  So I think that's it other

11     than the stipulations yet to come in, and to the extent you

12     can't work it out, if we have to have testimony, that is it for

13     the record, right, Mr. Kim?

14              MR. KIM:  Yes, your Honor.  Just to be clear, the

15     written stipulations we are talking about include stipulations

16     of fact, not just stipulations of admissibility of exhibits.

17              THE COURT:  Yes, I do understand that.  Thank you.

18              MR. GOLDMAN:  Your Honor, I am sorry, there is one

19     other issue.  We have stipulated with du Pont that we could

20     admit a limited portion of the deposition of Mr. Ahn, a 30

21     (b)(6) witness for Kolon Industries.  We can provide that in

22     writing to you as well after the closing if you like.

23              THE COURT:  How much?

24              MR. GOLDMAN:  It looks like it is a couple of

25     paragraphs from maybe, a couple of paragraphs from three pages.

 1              THE COURT:  Okay.

 2              MR. GOLDMAN:  It is a limited amount.

 3              THE COURT:  All right.  Then that's it?  Okay.

 4          So we're going to button this up by the end of the day

 5     unless we are coming back tomorrow, in which case we'll button

 6     it up tomorrow morning.

 7              Are you prepared to make closings?

 8              MR. KIM:  Yes, Judge.

 9              THE COURT:  All right.  So again this is meant to be a

10     true summary while the evidence is fresh in my mind and to

11     allow me to ask initial questions if I have them.  I'll give

12     you 30 minutes a side and then, as I said, we'll come to

13     agreement on a briefing schedule and I'll bring you back in for

14     argument.

15              Mr. Kim.

16              MR. KIM:  Yes, your Honor.  One thing you might find a

17     little odd is I do refer to some facts that would have been in

18     the factual stipulation.

19              THE COURT:  That is fine.

20              MR. KIM:  I will refer to them.  I know you haven't

21     heard them.

22              THE COURT:  I will ask you to stand because there is a

23     mike there.

24              MR. KIM:  Thank your Honor.  I think at the beginning

25     of the case I referred to the task of the court as being to

1  analyze jurisdictional agency principles, and the courts have

2  articulate this in several different ways, but the most common

3  concept that one sees is that if the affiliate at issue here,

4  Kolon Global, were not in New York, did not have, did not have

5  the contacts with New York that is relevant, with the out of

6  state company over which the court is seeking to exercise

7  jurisdiction, here Kolon Corporation, also known as Kolon

8  Industries, would that company do the same with its own

9  officials.

10         In other words, I think the way that translates to

11  this case is if Kolon Global were not pretending to have a New

12  York office and were not engaged in the activities they're

13  engaged in with respect to New York, would Kolon

14  Corporation/Kolon Industries, is it more likely than not that

15  Kolon Corporation would essentially do the same thing itself or

16  perhaps cause another Kolon Corporation subsidiary to do the

17  same thing, i.e., pretend to have a New York office and conduct

18  all of the activities around pretending to have a New York

19  office.

20         I know that there was a comment at the beginning of

21  the case about shifting positions, and this is made in my

22  opinion the briefings that were submitted so far are only

23  partially helpful because the court's task, obviously, in terms

24  of determining jurisdictional agency is first to determine the

25  relationship between the judgment debtor and the company that

1    we are alleging has direct contacts with New York.

2              Second, the court also has to look at whether we are

3    talking about actual contacts or a mix of actual contacts and

4    just pretend contacts with New York.

5              THE COURT:  Just focus on the pretend ones --

6              MR. KIM:  Yes.

7              THE COURT:  -- which is the holding-out theory.

8              MR. KIM:  That is ultimately what we concluded.

9              Some of the reasons you see a lot of shifting around

10   this, for a while we believed there was actually an office in

11   New York because you have to admit it was pretty confusing.  In

12   the end I am not sure, but I am almost sure it is just a

13   pretend office.

14             THE COURT:  Under your theory, let's say we weren't

15   dealing also with the agency issue, but just a pretend

16   presence, admittedly no -- if you have an entity that just

17   pretends to be here but isn't, general jurisdiction?

18             MR. KIM:  Yes, I think so.

19             I think the benefit that the company gets from

20   pretending to be in New York, in a fact pattern that will be

21   similar to this one is not simply a mistaken giving out a

22   letter with a New York number when it really meant a different

23   type of number.  It is not an isolated incident that is

24   specific to a particular transaction.

25             Where an out-of-state company engages in a systematic

1    campaign, essentially listing itself in the Yellow Pages, put a

2    New York office with a specific measurement in its annual

3    reports, giving out presentations to customers and sales agents

4    and other people with a map of the world with New York

5    ambiguously marked as if it is one of its facilities, I think

6    under those circumstances, under a due process analysis, when

7    it is then made to be a New York defendant in New York courts

8    and with a New York judge trying to assert jurisdiction over

9    it, I would say it is completely fair and consistent with due

10   process to exercise general jurisdiction over a company that

11   has been telling the world for its own benefit it operates in

12   New York on a permanent basis.

13            THE COURT:  What is your best authority for that?

14            MR. KIM:  So the best authority on those facts are all

15   the district court cases that I have cited.  The issue has not

16   squarely been addressed in the appellate courts.

17            THE COURT:  Not even a pretend one?

18            MR. KIM:  Not even a pretend appellate court, that's

19   right.  I think it is relevant here that for Kolon Global --

20            THE COURT:  But even at the district court cases, what

21   is your best authority for that proposition, that is to say --

22            MR. KIM:  I think it is Atrans is one of the cases I

23   cited to your Honor, and I mean I think in Atrans you have a

24   company similar to Kolon which has a number of affiliate

25   companies which I believe was like 60-something percent owned.

D52JDUP2                    Summation - Mr. Kim

The court didn't know the exact percentages, but it was a range
of percentages owned by the same family.

Here we have an affiliate group of companies that are
owned by the Lee family.  I think the Lee family essentially
controls greater than 50 percent of the Kolon empire starting
with Kolon Corporation, which is at the top of the entire Kolon
Group and that obviously is the relevant judgment debtor.

In that case the court, even though it observes there
are some other contacts, I would say it is analogous here, you
have some of the factual stipulations that were not read to
you, Kolon Industries itself did not just do mere solicitation
in the State of New York.  Kolon Industries itself did deals
with New York customers.  There is a dispute over whether
physical goods came into New York or the extent of it, but it
was not mere solicitation, and that is what the stipulations
will show.

In addition, Kolon Global, the company that we're
saying has New York contacts, itself was actually registered,
is still registered to do business in New York.  I Networks
predecessor has been registered for many years, and the courts
have observed that where a company is actually registered to do
business in New York, that is actually continuous and
systematic contacts.  This is not a case of somebody registered
it and forgot and walked away and forgot they had a New York
office and it is grossly unfair to assert jurisdiction because

1    of a piece of paper that was filed years ago.

2           As your Honor has seen, Kolon Global itself has

3    engaged in a systematic campaign to get the benefit of saying

4    they operated from New York.  Kolon Global, as your Honor

5    heard, is not itself just a company that is merely sort of

6    tangentially related to the judgment debtor.

7           The witness from Kolon Global stated that Kolon Global

8    itself doesn't actually manufacture anything, that one of its

9    lines of business is to buy materials from other Kolon

10   companies and resell it.  The figure he gave, of which he

11   argues only a small percentage is relevant to the United States

12   and to New York, to be fair, but the figure overall is in I

13   think over 200 million, $230 million U.S., and one can have a

14   lot of semantic debates about how important is New York in that

15   slice of the pie.

16          The best evidence of how important New York is is

17   really not all of us in the courtroom are strangers to Kolon

18   debating it, but really to look at how Kolon Global itself was

19   regarding the importance of New York.  Your Honor saw Exhibit

20   229, which is the internal analysis at Kolon Global which is

21   essentially the reseller for $230 million worth of Kolon Group

22   products, and I would argue the relevant subset there is not

23   the products advice just from the new Industries, but really

24   from any Kolon company because after the judgment debtor here

25   is Kolon Corporation, even though it is called Kolon

1    Corporation, but it was actually the entity which was sued

2    which owns everything, owns all of the Kolon companies that are

3    selling into Kolon Global.

4           Kolon Global itself said it just maintained a New York

5    presence.  It is only a few thousand dollars a month, and yet

6    they're getting tremendous benefit out of it.  It is a

7    bridgehead to the Americas market.  It allows them to portray

8    themselves as a global services company.

9           You saw on the map of all these brochures, you have

10   got all of these offices in, mostly in Asia as one would expect

11   from a company that originated in Korea and a little bit out in

12   New York.  Nothing in Americas, just one dot in New York.

13   Kolon Global itself clearly regarded what I have ultimately

14   concluded is probably a pretend presence in New York as vital

15   to its business certainly compared to the cost.

16          So in assessing if Kolon Global were not doing what it

17   was doing, would Kolon Corporation that gets, that is the by

18   far and large the majority shareholder of Kolon Global and

19   benefits tremendously from Kolon Global by having Kolon Global

20   resell all of these $230 million worth of product from other

21   Kolon companies, whether Kolon Corporation, where there is more

22   likely than not they would take the step of pretending to have

23   a New York office.

24          In answering that question, one need not just

25   speculate about the state of mind of people sitting in Korea,

D52JDUP2                        Summation - Mr. Kim

1    what they would have to do.  You have to look at the history of

2    how we ended up here.

3           Kolon Industries, the old Kolon Industries, now

4    actually Kolon Corporation, actually was registered to do

5    business here.  They started -- we are not clear when they

6    started.  The clues we have is the biographies that you saw,

7    that you saw which are the biographies of the head of the

8    entire Kolon Group from -- remember there was a grandfather,

9    the father and the current person in charge of the Kolon Group,

10   that the father of the person in charge and the current

11   chairman both listed on their biography that they started in

12   the New York branch of Kolon Industries.

13          Of course, one of the other exhibits also showed that

14   the current CEO of Kolon Industries also listed on his bio that

15   he started the New York branch of Kolon Industries.  Clearly

16   Kolon Industries, the judgment debtor, Kolon Corporation began

17   in New York and accorded sufficient importance to New York that

18   they actually specifically listed it on their bios of the CEO.

19   You also saw evidence it got taken out after these proceedings

20   started, but you do have the old version available to you.

21          You saw evidence that Kolon Corporation, then known as

22   Kolon Industries, was actually registered to do business in New

23   York with the New York State Department of Corporations, that

24   it continued on until 1999.

25          Now, has it ended in '99?  Is it fair to infer because

1   Kolon Industries just lost interest in New York and decided it

2   really wasn't that important any more?  I don't think that is

3   fair.  I think it is more likely than not that what happened

4   was that Kolon Industries decided it could get the same benefit

5   by just having one of its subsidiaries pretend to have an

6   office in New York.  So you saw the progression of the

7   registrations to do business goes up to '99 with Kolon

8   Industries, and then it converts to, you see a Kolon --

9   sorry -- 2002.  I misspoke.  It it goes up to 2002.  The record

10  we have says '99 to 2002.  We know it must have been earlier

11  because the biographies of the CEOs cite the 80's and one cites

12  the 70's as a New York branch of Kolon Industries.

13          But from 2002 on, you see another filing that says

14  Kolon I Networks is registered to the present day, and then in

15  that record it also shows a predecessor company called Kolon

16  International had it for a certain period of time until it

17  merged into I Networks.

18          (Continued on next page)

19

20

21

22

23

24

25

D52ddup3                          Summation - Mr. Kim

1              MR. KIM:  So you see it's actually a continuous

2     presence in New York with Industries essentially having these

3     newly formed subsidiaries, with I'Networks, eventually Global,

4     being a subsidiary whose function -- one of its functions being

5     to buy product from Industries, and other companies by

6     Industries Corporation, and just resell it, using the either

7     the real or New York office as a bridgehead for servicing,

8     marketing to customers in the Americas, including North America

9     and New York.

10             So I think in trying to determine is it more likely

11    than not that absent this litigation -- of course, now they

12    want to have nothing do with New York after looking at some of

13    the New York law, but absent this litigation, is it more likely

14    than not that Kolon Corporation would essentially cause one of

15    its other subsidiaries to do the same thing, or would itself do

16    the same thing, i.e., pretend or actually have an office in New

17    York, I think the probabilities are squarely in favor of saying

18    it is more likely than not that they would have done so because

19    they did it in the past and stopped doing it only,

20    coincidentally, with subsidiaries taking over and doing exactly

21    the same thing.  And you'll see in those registrations the

22    subsidiaries literally just came and took over the exact same

23    address that was in the registrations.

24             Now, I think it is also important to note that Kolon

25    Global itself is not the only one pretending to have a New York

D52ddup3                          Summation - Mr. Kim

1    office.  Exhibit 74 and 75, which come from the files of Kolon

2    Industries' customers -- now, this is Kolon -- you have both

3    one from 2009 and one from 2010.  Now, you recall the

4    restructuring happened at the very end of 2009.  So one

5    brochure was at least extant at the time before the

6    restructuring and one afterwards.  And it is clearly -- these

7    are clearly brochures of Kolon Industries, not Kolon Global,

8    again with multiple maps ambiguously pretending like they have

9    an office in New York.

10          Now, you will see one of the stipulations is Kolon USA

11   didn't have an office in New York.  There is no evidence that

12   any Kolon entity had an office in New York except Kolon Global

13   possibly just pretending to have some.

14          These two other exhibits show that in addition to

15   benefiting from having Kolon Global, its sales agent, its

16   reseller, pretend to have an office in New York, Kolon

17   Industries, the judgment debtor, directly, in the lines of

18   business it kept, also pretended to have an office in New York.

19          Now, this is not a case where we're saying, well, just

20   because somebody said they were in New York we should exercise

21   jurisdiction.  Kolon Industries itself did have contacts with

22   customers in New York.  The factual stipulations will show that

23   there were contacts with various customers in connection with

24   especially the fashion and retail industry, which is very

25   important to Kolon and obviously to New York.

D52ddup3                    Summation - Mr. Kim

1            I think I told you in the beginning candidly, you

2      know, if we were here just arguing based on just the direct

3      contacts of Industries to New York, it is not a compelling or

4      overwhelming amount of contacts, especially when we're asking

5      you to exercise general jurisdiction; but I think in

6      combination with these other facts, it is quite compelling that

7      we are not just arguing just because they solicited some people

8      or pretended to have an office in New York a few times we

9      should exercise jurisdiction.  This is clearly you are entitled

10     to infer that the reason Kolon Industries both pretends to have

11     an office in New York itself, as shown by 74/75, and basically

12     substituted Kolon I'Networks Global in its place to then

13     pretend to have an office in New York and resell its own

14     products in North America is because it does have relevant

15     business in New York and it does have relevant business in

16     North and South America that benefits from having -- either

17     having or pretending to have a base in New York.

18            You also heard from Mr. Ahn, who testified that when

19     he was working for Kolon Global, in addition to buying,

20     essentially, and reselling products from other Kolon companies,

21     including Kolon Industries, he was also involved in the

22     marketing of Miocell, which was a product manufactured purely

23     by Kolon Industries.  So it wasn't just the buying and

24     reselling of material, it was really also a sales agency,

25     trying to create a sales channel for Kolon Industries, the new

D52ddup3                    Summation - Mr. Kim

Kolon Industries, to be able to sell.  And this is all from, I

guess, the New York branch, which, depending on whom you

believe, is either an actual office in Koreatown here or just

Mr. Ahn himself, the human being.

          But clearly it is confusing enough to outsiders.

Certainly I've got to say we were confused, and we actually

believed for some time there was a New York office, which is

why you see a lot of arguments saying they were their direct

contacts.

          There was a statement that we offered into evidence

not for the truth but just to show you how accustomed Kolon

officials were in pretending to have a New York office, Exhibit

59, paragraph 18, was a declaration submitted earlier in this

case at the very beginning by a Kolon Industries official,

Mr. Jung, saying that Kolon Global, Kolon I'Networks has a New

York office.  He later said that was a mistake, and that part

has been stipulated into the record as well.

          My position is not, huh, I got you, he said there was

a New York office.  My position is they are so accustomed to

pretending to have a New York office, if in fact there is a New

York office he just made a mistake and ended up saying he had a

New York office -- that Kolon Global had a New York office

because it has been said so many times.

          I think, Judge, the essence of our case is that you've

got a company, Kolon Global, that is subject to the

1    jurisdiction of this court by virtue of its registration, by

2    virtue of its interface with customers in New York -- not just

3    merely solicitation but actual service of customers in New

4    York -- and by virtue of its pretending to have a New York

5    office, and that there is a proper jurisdictional agency

6    finding that can be made between Global and its activities and

7    Kolon Corporation, because Global, while it does business on

8    its own account -- I'm not saying it is a puppet or just an

9    alter ego of Corporation, it does do business that is really

10   just the judgment debtor's business.  It functions as both the

11   reseller of the judgment debtor's products, such that the

12   judgment debtor benefits directly from Global's marketing

13   prowess and the ability to market using New York as the

14   bridgehead, and, as you saw in the Miocell example, Global

15   functions as a sales channel for the judgment debtor's

16   products.

17          And so at least the district courts that have examined

18   the issue appear to say that where the company that is subject

19   to the court's jurisdiction is conducting business that if it

20   didn't conduct that business the out-of-state company would do

21   it with its own officials or would cause it to be done, I think

22   that's exactly what we have here.  I think what we have here is

23   a judgment debtor -- an out-of-state judgment debtor that

24   was -- that considered New York sufficiently enough, important

25   enough to be here themselves, and, also, when they were

1   reorganizing to form subsidiaries, newly form subsidiaries and

2   make them do essentially the same thing that they were doing,

3   which is selling their products out of either a real or

4   pretended New York office and you have this conduct continuing

5   past the filing of the turnover application to the present

6   day -- Kolon Global is still selling Kolon Group products.

7   It's still pretending to have a New York office, as far as we

8   can tell.  And I think under these circumstances it fits

9   squarely within ultimately the district court case law that

10  holds it is fair to exercise general jurisdiction over a

11  company that is out of state and yet benefits from having one

12  of its affiliates pretend that there is a New York operation.

13          So I think, you know, in some ways the two points that

14  I had pointed out in the very beginning, the holding oneself

15  out and agency, really just collapse into the same line of

16  analysis, which is --

17          THE COURT:  Do they collapse, or are you trying to

18  put -- make the whole greater than the sum of the parts?  That

19  is to say, do you need both?

20          MR. KIM:  I don't think I need both.  I mean, I think

21  the 74 and 75 -- let's say we didn't have an agency argument,

22  let's say there were no Kolon Global and all we had was just

23  Industries and whether it had direct contacts with New York.

24  Then one would analyze it as follows:

25          The factual stipulations show that Industries engaged

D52ddup3                      Summation - Mr. Kim

1    in more than mere solicitation.  The courts -- the cases on

2    just general contacts with New York basically say mere

3    solicitation is not enough, but if you have solicitation-plus,

4    it can be enough for exercising general jurisdiction.  It is a

5    question of quantity, obviously; there is no mathematical rule.

6            THE COURT:  But for it to be sufficient as a

7    constitutional matter for general jurisdiction, you would have

8    to show, wouldn't you, systematic and continuous --

9            MR. KIM:  Yes.  And I think that's what the factual

10   stipulations actually show.  In other words, it is not mere

11   solicitation, it's actually the servicing -- it's actually

12   servicing of customers that are based in New York regardless of

13   where the physical products actually end up.  It's sending

14   their officials into New York to interface with the fashion

15   industry.  Some of the most important companies they interface

16   with are John Jacobs in Barbados, which are headquartered here

17   in the fashion industry, and that, in combination with we don't

18   know why their sales brochures from, you know, past 2010 are

19   not available, but certainly the ones from 2009 to 2010 that

20   you see in 74/75 show that they, meaning the judgment debtor,

21   the ultimate parent company, Industries, were telling customers

22   that they do business out of New York.  So I think even on

23   those facts there is sufficient basis to exercise general

24   jurisdiction over Industries.

25           THE COURT:  That does sound to me -- I'm new to some

D52ddup3                    Summation - Mr. Kim

1    of the New York cases that you've brought to my attention.  But

2    as a former civ pro teacher anyway, those sounded like minimum

3    contacts to me.  Those sound like the kind of arguments you

4    would make in the context of specific jurisdiction.

5            So when I hear sort of solicitation-plus, even in and

6    of itself, I would be surprised if it's right to think that the

7    cases support something that is a couple of visits and a little

8    bit of solicitation to be sufficient for general jurisdiction.

9            MR. KIM:  To be frank, I think if it were just the

10   direct contacts that Industries had with New York that is in

11   the factual stipulation, I think it is pretty thin.  I think

12   when you combine it with Industries holding itself as operating

13   in New York, I think you get over the hurdle on even just the

14   specific Industries -- I shouldn't say "specific," even on the

15   particular Industries due process analysis to 74 and 75.

16           Now, you know, I think the reason that I say that all

17   the agency principles I think are really important here is

18   because it would be a mistake to view this in isolation if

19   there is Industries over here and there is Global over there

20   and we are somehow unfairly trying to say, well, because we

21   can't meet the burden on just Industries, we're just going to

22   take this other random affiliate here who does some stuff in

23   New York and kind of slap them together.  Actually, I am not

24   the one who put these companies together; Kolon is.  Kolon is

25   the one that is using Global -- and it doesn't make anything --

D52ddup3                    Summation - Mr. Kim

to resell their products, essentially both function as a

reseller and a sales agent.  And I think it is the presence of

a sales agent, even an independent sales agent in New York,

that ends up being important in the case law.  Because Kolon,

the judgment debtor corporation, has as its economic interests

all the Kolon subsidiaries that benefit from selling to Global.

And you've got the fact that Global itself, despite they're

trying to kind of squirm out of saying they have New York

contacts, squarely within the Court's jurisdiction.

So I think -- that's why when I say "collapsed" I

don't mean -- you know, because I don't want you to see that

the Industries' sole contacts are weak, that I want to just mix

them altogether hoping you won't notice.  I give you more

credit than that.  When I say "collapsed," I really mean that

the analysis of whether in the Kolon Group as -- and their

agency principals is separate from Kolon Industries on its own,

as if these are two totally separate concepts for you to

resolve one at a time I don't think is accurate.  Because

Global itself essentially took over from Industries the chain

of registrations that they have kept for quite some time in New

York.  And you also see Global itself is a company that really

functions as a reseller and sales agent.  That's why I think it

makes sense to really think of them as really one issue, which

is that these are just the various ways in which Kolon

Corporation has gotten for itself the benefit of associating

1    itself with New York first directly and then after 2002 through

2    I'Networks and Global.

3           THE COURT:  Just you are using Kolon Corporation in

4    that sentence interchangeably with Industries, right?

5           MR. KIM:  Correct.

6           THE COURT:  You've switched back and forth in the

7    course of the summation between --

8           MR. KIM:  Yes, depending on the point, like Miocell is

9    actually a product of --

10          THE COURT:  Industries.

11          MR. KIM:  -- the new Kolon Industries, because that

12   is -- and the time period in which it occurred and so forth.

13          But what I mean when I am talking about Kolon

14   Industries, the judgment debtor, is the same entity that used

15   to be called Kolon Industries, now it is called Kolon

16   Corporation.

17          THE COURT:  Right.

18          MR. KIM:  That's the legal person that owns all of the

19   other Kolon companies that are basically using Kolon Global as

20   its reseller and sales agent.

21          It would be unfair, I think, and really contrary to

22   logic, that after having separated itself into two as a result

23   of restructuring in the middle of the litigation Kolon were now

24   able to say, well, we're just a holding company, we don't

25   really do anything, so therefore we can't be subject to

 1    anyone's jurisdiction, period, we just own shares of other

 2    companies.  The fact is that the defendant who was sued was an

 3    operating company, named Kolon Industries; the same legal

 4    person now is Kolon Corporation and happens to have taken some

 5    of the assets and put it into a pocket that it named Kolon

 6    Industries, its own subsidiary.

 7              The fact is the Kolon Global that operates here, and

 8    that has greatly benefited the rest of the Kolon Group, has

 9    always been a subsidiary, a direct subsidiary, of Kolon

10    Corporation, formerly known as Kolon Industries.

11              THE COURT:  All right.  Thank you, Mr. Kim.

12              MR. POLLACK:  Your Honor, before I begin, I am handing

13    up to the bench a compilation of a few of the select cases on

14    which we will rely.  I know that du Pont provided you with

15    their case law at the commencement of the proceedings.  And

16    these are some of the cases that we will be citing in our

17    brief.

18              Your Honor, I think you asked a very important

19    question to the outcome of these proceedings.

20              THE COURT:  You like my questions, I've noticed.

21              MR. POLLACK:  Let's hope I do better answering them

22    than I was attempting to do the other day.

23              THE COURT:  You don't have --

24              MR. POLLACK:  The question that I am focused on is

25    whether the two strands or the two theories that du Pont began

1    this hearing with two days ago really collapse onto themselves.

2    And our position, Judge, is that du Pont has very confusingly,

3    and entirely inappropriately, conflated these two theories into

4    a single inquiry, because they can't get to a holding out

5    theory as it relates to Industries itself and they are

6    dependent on the agency argument as it relates to Global, and I

7    want to amplify and emphasize that point throughout my comments

8    today.  But it is noteworthy today that notwithstanding the

9    fact that when this proceeding began two days ago, you heard

10   counsel tell you that, in all candor, the evidence as it

11   relates to Industries' direct dealings in business in New York

12   is not all that compelling.  Now, at the eleventh hour they

13   have lopped in dozens of documents that they're going to argue

14   in their briefs support jurisdiction based upon Industries'

15   direct contacts.

16         Now, these were subjects that were extensively briefed

17   before Judge Sweet and, indeed, before Judge Koeltl last year.

18   You were told two days ago that the briefing here -- that

19   briefing is not all that germane to the issues that are

20   actually going to be before the Court.  And I suggest to you,

21   Judge, that the reason that these issues are now again being

22   injected is evidence that they recognize that the two theories

23   that they suggested are going to be the primary basis that

24   their case simply don't hold water.

25         Let me start by addressing those two theories and,

D52ddup3                    Summation - Mr. Pollack

1    time permitting, I will speak to the new theory, but that will

2    be extensively briefed, I assure you.

3            So first with respect to whether Industries itself

4    holds itself out to do business in the State of New York.  I'll

5    refer to this as the constructive presence theory, because it

6    doesn't assume actual presence.

7            Now, I think the parties are in agreement as to what

8    the standard is.  There has to be continuous and systematic

9    contacts.  Indisputably the relevant timeframe for assessing

10   those contacts is the date that the turnover motion was filed

11   in New York, which, as you know, was May of last year.

12           Now, the Court obviously has accepted evidence that

13   predates May of last year, over our objection.  But I think the

14   law is very clear, your Honor, that the only possible relevance

15   of such dated evidence is if it can be connected up and if it

16   can be shown that it involves a continuous course of conduct

17   that continued to and through May of last year.  So, for

18   example, you heard even today reference to biographies that go

19   back 40 and 30 years.  You heard reference to the fact that

20   Industries may have had an office in New York in the late '90s

21   but indisputably closed no later than 2002.  I submit to you

22   that under the law none of that evidence is properly relevant

23   when you are looking at whether Industries today is

24   continuously engaged in business in New York.

25           So their theory of constructive presence, your Honor,

D52ddup3                    Summation - Mr. Pollack

1   simply is not supported by the actual evidence.  I'm glad that

2   we are here today just a few hours after the close of the

3   record because I am confident that the evidence is well known

4   to your Honor and you can understand when and to what extent

5   counsel is taking liberties with that evidence.  The various

6   brochures and Internet screenshots that you saw over the last

7   two days were very clear in their description that they were

8   relating to Global and I'Networks' business network.  None of

9   them -- and I will speak to 74 and 75 momentarily, but with the

10  exception of those, Judge, all of those presentations had

11  nothing to do with Industries.  Those cannot form the basis of

12  an argument that Industries was holding itself out as being

13  present in New York.

14          Now, counsel wants you to focus on two exhibits, 74

15  and 75.  And as you know -- first of all, those exhibits were

16  accepted for a very limited purpose, simply to establish that

17  they were produced to du Pont by third parties in the case.

18  And we contend, your Honor, that is it is impermissible to

19  argue anything beyond that limited and accepted purpose.  That

20  notwithstanding, the evidence cannot support the arguments that

21  were made here today.

22          First of all, those presentations date from 2009 and

23  2010.  There obviously is no evidence in this record to support

24  any ongoing representations made by Industries at any relevant

25  timeframe.

1        Secondly, there is no evidence that when you look at

2   the actual exhibits, your Honor, you will see the references

3   are not to Industries but they are to Kolon USA, or KUSA, as it

4   is depicted on the maps.  And so again they are ambiguous, at

5   best, but certainly cannot be construed to represent that

6   Industries is holding itself out to the world as being present

7   in New York.

8        And that's all they have as it relates to Industries,

9   Judge.  At the end of the day their argument will be -- and

10  this is why we spent all this time on these issues this

11  morning.  At the end of the day their argument is going to turn

12  not on the evidence that they have but on the evidence that

13  they feel that exists that they don't have.  And as your Honor

14  observed earlier, there is no basis in this record before your

15  Honor to permit those sorts of inference.  The actual evidence

16  of record does not substantiate this constructive presence

17  theory for Industries.

18       And we have given you many cases to that effect.  You

19  asked about some of the case law.  Obviously, this is highly

20  fact-specific and so you are going to find cases that go both

21  ways.  We have given you several cases that conclude that mere

22  advertising is not enough to permit jurisdiction under the

23  State of New York law or federal constitutional standards.  The

24  Safety Software case out of New York is particularly relevant

25  in our point of view, your Honor, because there, as here, the

1    plaintiff was asserting a constructive doing business theory on

2    the basis that the defendant allegedly held itself out as being

3    present in New York.  And the facts that are summarized in that

4    days -- this is out of the Southern District last year -- were

5    that the plaintiff --

6             THE COURT:  What case are you talking about?

7             MR. POLLACK:  This is the <u>Safety Software</u> case.  It's

8    in our binder, Judge, and it is the first section at Tab 3.

9             You will see, when you have a moment to look at that,

10   that the plaintiff was asserting that the defendant maintained

11   an office in New York with an actual mailing address in New

12   York, directed third parties to contact it at that mailing

13   address, and used one of these virtual office service providers

14   to facilitate the actual delivery of correspondence to it out

15   of New York.  Notably, in this case this was presented before

16   there was a contested evidentiary hearing, and the Court

17   considered all of those allegations in the light most favorable

18   to the movant and found that that was not sufficient to make

19   out a prima facie case, even despite the fact that the Court

20   accepted that there was an actual office in New York for 18

21   months, without any additional evidence of business activity.

22            So that is one of the cases that we will point your

23   Honor's attention to.  The several cases that counsel alluded

24   to in their opening and has provided to your Honor are readily

25   distinguishable, and we will obviously do that with great care

1   in our briefing.  But I should tell you that in the one case

2   that was invoked by counsel, the principal in that case in its

3   advertising material suggested that its principal office was in

4   New York.  There is nothing in this record remotely suggesting

5   that Industries was promoting its principal office as being in

6   New York.

7           Several of their cases likewise occur under the -- are

8   analyzed under the prima facie test and where the Court has to

9   indulge every inference in the movant's favor -- not so here --

10  and in every one of those cases there was much more than just

11  this constructive presence.  In each case the Court found there

12  was actual business taking place in New York as well.  So, as I

13  say, we will readily distinguish those for you at the

14  appropriate time.

15          THE COURT:  Is that -- just back to the I think it is

16  Judge Mukasey's decision, the one that you referenced.  The

17  point of distinction you are drawing is the difference between

18  holding a principal office out versus something else?

19          MR. POLLACK:  Well, no.  In that particular case the

20  materials that were relied upon suggested that the principal

21  location of the company was in New York -- quite different from

22  suggesting that there might be a branch office in New York.

23  And as you know, our position is that there is nothing in this

24  evidence to suggest that Industries was even suggesting as

25  such.  That evidence all relates to Global.

D52ddup3                        Summation - Mr. Pollack

1           THE COURT:  Right.

2           MR. POLLACK:  So let me turn to Global now and try to

3      address the point as to why, under the established principles

4      of agency law, none of the evidence that relates to Global is

5      properly imputable either to Corp. or to Industries.

6           Let me first speak to Corp. quickly and try to clarify

7      our position on that issue.

8           The relevant jurisdictional period, your Honor, is

9      2012.  Three years earlier this restructuring took place.  So

10     as of 2012 Global Corporation indisputably is a holding

11     company, and the law is quite clear that you cannot impute on

12     an agency basis a subsidiary relationship to a parent if the

13     evidence shows that the parent is simply an investment

14     vehicle -- a holding company that invests in the subsidiaries

15     and does not operate through them.  And this record is -- there

16     is nothing to the contrary in this record.  So, ultimately,

17     this is going to come down to whether the acts of Global may

18     properly be imputed on an agency basis to the operating

19     company, its sister company, Industries.

20          And the actual evidence, your Honor, leaves no doubt

21     that these two companies have always operated independently of

22     one another.  You have heard the evidence, how substantial they

23     are, and their different business focuses.

24          There is a case that we think is most relevant to the

25     legal question, your Honor, and that is the Six Flags case --

D52ddup3                    Summation - Mr. Pollack

1    that also is included in our materials -- that, as applied to

2    the analysis here, asks the question would the revenues

3    generated by Global in New York be large enough such that

4    Industries would be forced to enter New York in the absence of

5    Global to make up for the financial losses?  I suggest that to

6    ask that question leads to its obvious answer.

7          How much business is Global actually doing in New

8    York?  The evidence is just a few hundred thousand dollars a

9    year.  Both Global and Industries have annual business of

10   approaching $4 billion.  The question is not whether Global may

11   be deemed to be present in New York or pretend to be present in

12   New York, the question is whether they are actually engaged in

13   enough business in New York such that Industries would feel the

14   business compulsion to be present itself.

15         THE COURT:  What do you do with the fact of Global's

16   registration?

17         MR. POLLACK:  We recognize that fact, Judge.  There is

18   case law going both ways.  There is the Belle Pointe case in

19   our materials that analyzes exactly that question under the

20   federal due process standard, and says that registration itself

21   alone is not a sufficient basis to confer jurisdiction and it

22   would violate due process to so conclude.

23         Let me be very candid, Judge, at the end of the day

24   this case is going to come down to whether Global's business in

25   New York can properly be imputed to Industries.

1           THE COURT:  Yes.

2           MR. POLLACK:  We don't -- there is all this up and

3      back as to whether and at what point there actually was a

4      physical office in New York.  At the end of the day, Judge, I

5      think that really is beside the point.  I think the fair

6      reading of the evidence is that there hasn't been an office for

7      many years, that when Mr. Ahn left in New Jersey they just

8      didn't pay attention to details and didn't terminate the

9      registration and continued to make references.

10          But even if today Global had an office on Fifth

11     Avenue, with a receptionist and a sign on the doorway, it

12     wouldn't matter because Global's actual presence in New York,

13     or its constructive presence through its advertising materials,

14     only becomes relevant if on an agency theory it can be imputed

15     to Industries.  And the only way that can happen, your Honor,

16     under the established law, is if you can conclude that Global's

17     business was for Industries' benefit and it was so substantial

18     that Industries would feel compelled to come into the

19     jurisdiction to take that business over.  And the actual

20     business has been shown to be de minimis, and that de minimis

21     business is not for Industries' benefit, it is for Global's

22     benefit.

23          Now, counsel referred to Miocell.  And Miocell,

24     understandably -- I can understand why they like Miocell

25     because Miocell is a product that was manufactured -- that is

D52ddup3                    Summation - Mr. Pollack

manufactured by Industries.  But what the actual evidence

shows, your Honor, is that when Mr. Ahn was asked to market and

sell Miocell, he was being asked to do that on behalf of

Global, not on behalf of Industries.  Any such business conduct

that would have taken place would have benefited Global, not

Industries.

          Most importantly, Judge, no such business ever took

place.  Mr. Ahn told you that went by the wayside.  There was

no actual business generated in New York, or anywhere else.

And so, again, harking back to the standard, was the business

in New York of such a magnitude that Industries would feel

compelled to be here if there wasn't any Miocell business?  Nor

was there any steel business.  The only business was the couple

of hundred thousand dollars in annual sales that you heard of

for Industries' benefit, not for Global's -- excuse me, excuse

me, for Global's benefit, not for Industries'.

          So we think that at the end of the day what's

happening here is du Pont is conflating its two theories in a

way that the law simply does not permit, because the law does

not permit your Honor to find agency imputation under an agency

theory based simply upon constructive or pretend presence in

the absence of actual substantial business activity in New

York.  And absent that agency relationship, none of the

evidence relating to Global's business -- activities in New

York becomes relevant when you assess whether Industries, or

1    Corp., either one, is doing business in New York.

2            As I said, even if Global were here, it wouldn't alter

3    the analysis.

4            So to wrap it up, your Honor, we think that du Pont's

5    ever changing theories, even throughout this hearing, lack

6    factual as well as legal support.  We do give them credit for

7    their creativity, but no amount of creativity or persistence

8    can mask the facts.  Industries is not actually present in New

9    York, and there is no evidence to suggest that Industries in

10   any relevant period of time has been holding itself out as

11   being present in New York.

12           The evidence as it relates to Global may not be

13   imputed to Industries or to Corp. on a proper application of

14   established agency principles.

15           As your Honor knows, this case is tremendously

16   important to both parties.  The ramifications to our client are

17   potentially enterprise-threatening.  We are all grateful that

18   your Honor was so flexible with her calendar, and we understand

19   that your Honor will pay careful attention to the briefing.

20           We look forward to returning as soon as the briefing

21   is completed.  Thank you.

22           THE COURT:  Thank you, counsel.

23           All right.  Let's talk about a schedule.  Have you

24   reached agreement?

25           MS. TENDLER:  Your Honor, we have agreed on a

D52ddup3

suggestion for process.  We differ on the amount of time that

the parties should be given to complete that process.

         I believe the parties are in agreement that at least

it is our view that it makes sense to have a simultaneous

exchange of opening briefs followed by a simultaneous exchange

of replies.

         As I said, we differ on the schedule.  We have asked

that all briefing be done by May 24th, which is the Friday

before Memorial Day weekend.  That would allow two weeks from

tomorrow for openings, at May 17th, and replies one week later,

on May 24th.

         We've heard your Honor's suggestions about the likely

length that will be given for these submission.  The parties

have been living with this for a long time.  We obviously all

already identified the relevant cases, and the facts are sort

of well known to the people sitting in this room.  We think

that the briefing can well be completed before Memorial Day.

         THE COURT:  All right.

         MR. GOLDMAN:  Your Honor, may I respond?

         THE COURT:  Yeah.  I thought that was the point.

         MR. GOLDMAN:  Our position is that we would like to

have four weeks to do the opening briefs and then each side

have two weeks to do a simultaneous opposition.

         THE COURT:  OK.

         MR. POLLACK:  Judge, if I can just amplify a little

D52ddup3

1    bit the basis for that request?

2              Part of it is personal.  I have substantial

3    commitments next week and the following that will really

4    prevent me from paying appropriate attention to the briefing,

5    and I would like that opportunity.  As you know, our client is

6    in Korea, and that creates additional time pressures for us.

7    We need to give them ample time to review drafts before they

8    are finalized and submitted.

9              THE COURT:  So you propose two weeks and one week, and

10   you propose four weeks and two weeks?

11             MR. GOLDMAN:  Correct.

12             THE COURT:  I'm going to noodle a bit and let you

13   know, because since you still have some things to work out, I'm

14   going to come back and close out the -- hopefully close out the

15   record today, and then I'll let you know what I want to do.

16             I have to say on your point of agreement, I think I

17   disagree.  I'm inclined -- you can persuade me otherwise -- not

18   to do two simultaneous and simultaneous, which then means I'm

19   reading four briefs, two of which don't talk to each other.  I

20   would rather have the movants open and then a response and then

21   a reply, because otherwise I'm left with documents that don't

22   speak to each other.  So that's my -- go ahead.

23             MS. TENDLER:  Your Honor, that's fine with us as well,

24   and we still think that could be done within, you know, the

25   three-week timeframe we proposed.

D52ddup3

1          THE COURT:  You want a week and a half?

2          MS. TENDLER:  We will work it into the calendar.  I

3     don't think that changes what our view is on the timeframe.

4          THE COURT:  And your sense of -- I understand their

5     sense of delay.  And your sense of emergency is what?

6          MS. TENDLER:  Well, it's not as much a sense of

7     emergency.  I will say I think we -- as we expressed to your

8     Honor when we were first here before you sort of asking you to

9     take this, it is our view, and through no fault, in our view,

10    of the parties, that this has sort of languished long enough.

11          In addition, you know, we also have some personal

12    commitments in the last week of May that our preference would

13    be to resolve this before that, but --

14          THE COURT:  It won't be resolved before that.

15          MS. TENDLER:  Time to have the briefing complete.

16          THE COURT:  I recognize that I should be here working

17    on Memorial Day weekend and you all should be on the beach.

18    But whatever time of the briefing, I want to bring you back in

19    for argument, I think, and I need to write an opinion.  So it

20    won't be resolved --

21          MS. TENDLER:  At least have the briefing closed out.

22          THE COURT:  OK.

23          MS. TENDLER:  We think the issues are sort of

24    discrete, and the parties here, we all know the cases.  I just

25    don't think it needs to take six weeks.

361

D52ddup3

```
1          THE COURT:  I will come to agreement on a final
2   schedule.
3          But your view is -- and I don't disagree with this.  I
4   mean, I don't think I need proposed findings, for example.  I
5   think just briefing is sufficient, though presumably I will
6   make factual findings.
7          OK.  All right.  I'll let you know the final schedule.
8          How much time do you need?  What do you propose just
9   in terms of when we make everyone come back here?
10         MR. GOLDMAN:  I don't think we need to come back.  I
11  think at this point we are just going to suggest written
12  stipulations to the Court and we are finished.  So I don't
13  think we have to be here in the courtroom to do that.  We can
14  just submit them from our office and file them by ECF and fax
15  them or hand-deliver them to you, however you would like to do
16  that.
17         THE COURT:  So written stipulations are going to come
18  in, which I will mark as a court exhibit.  The deposition
19  designation that you indicated a couple of paragraphs are going
20  to be, on consent, admitted.
21         I would like you to check a final exhibit list -- to
22  produce a final exhibit list and check it with my deputy as to
23  what you all agree, and we will make sure it is consistent with
24  our records, is in and then I will mark that as a court
25  exhibit.  And then that will be it unless we have to come back
```

D52ddup3

 1    Monday morning.

 2              MR. GOLDMAN:  Then we will also submit to your Honor a

 3    binder of all the admitted exhibits.

 4              THE COURT:  Yes, a copy set of what's on the agreement

 5    list.

 6              MS. TENDLER:  I think the only other issue -- item

 7    that the parties owe the Court is I believe Kolon is going to

 8    submit a list of documents by which they are reserving their

 9    relevance objection.

10              THE COURT:  All right.  OK.  And that will be it.

11              All right.  That's fine.  So I don't need to see you

12    again.  We will just put out an order with the briefing

13    schedule.  It will come out today, shortly.  I just want to

14    think a little bit longer and look at my own schedule.

15              I thank counsel and all support staff for what was

16    excellent argument under unusual circumstances.  Thank you.

17              We are adjourned.

18              THE CLERK:  All rise.

19

20                              -  -  -

21

22

23                         PLAINTIFF EXHIBITS

24    Exhibit No.                                   Received

25     7, 21, 22, 32, 45, 49, 55-58, 61, . . . . . . 295

D52ddup3

          67-70, 107, 108-118, 120, 256

 97 and 261    . . . . . . . . . . . . . . . 324

 96    . . . . . . . . . . . . . . . . . . . 325

                      DEFENDANT EXHIBITS

Exhibit No.                           Received

 K13, K14, K40-K42, K60, K61   . . . . . . . . 297

 K62    . . . . . . . . . . . . . . . . . . . 325